UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JUAN SEGOVIA and VICTOR FLORES,
on behalf of themselves and all others
similarly situated,

     *Plaintiffs*,

v.                                                          **Case No. SA-17-CV-1246-JKP**

FUELCO ENERGY LLC,                              **(Consolidated with
                                                                Case No. SA-19-CV-1129-JKP)**

     *Defendant*.

## MEMORANDUM OPINION AND ORDER

Before the Court is *Defendant Fuelco's Motion for Decertification of Collective Action* (ECF No. 120). Defendant Fuelco Energy LLC ("Fuelco") seeks to decertify this case as a collective action. With the filing of Plaintiffs' response (ECF No. 124) and Defendant's reply brief (ECF No. 126), the motion is ripe and ready for ruling. After considering the motion, other briefing, pleadings, all presented evidence, and the applicable law, the Court denies the motion.

## I. BACKGROUND[1]

As a fuel supplier for gas production companies, Defendant employs individuals to provide fuel for customers at their gas hydraulic fracturing sites ("job site").[2] On a typical job site, Defendant assigns two fuel trucks (known as "bobtails"), each with a two-person crew – a driver and an operator or technician. Defendant would thus have a four-member crew for both shifts (night and

---

[1] For purposes of this motion, the facts are mostly uncontested. The Court will note any material, contested fact.

[2] "Hydraulic fracturing is a technique in which a liquid is injected under high pressure into a well in order to create tiny fissures in the rock deep beneath the earth which then allow gas and oil to flow into the well." *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/fracking (last visited May 19, 2021). This technique is often referred to as "fracking." *See id.* While those in the gas and oil industries often use "fraccing" or "fracing," Merriam-Webster has accepted "fracking" as the most appropriate spelling. *See id.* The Court will utilize the k-version of "fracking" and any variation of the term.

day). Therefore, there is typically a crew of eight for each job site. Each bobtail remains on site for the duration of the job. Crew members work together to provide fuel to equipment at the site.

Given the nature of the job sites – often located in remote areas – and the lengthy nature of each job project, Defendant lodges its crews at the nearest hotel or at a "man-camp" (collectively referred to as "hotel") for the duration of the project. Defendant would provide a van or truck (collectively referred to as "van") to transport crews between the hotel and job sites. Usually, both shifts would use the same van with one shift using it to travel to the job site and the departing shift using it to return to the hotel. Sometimes, a member of the working crew would drive to the hotel from the work site, pick up the next shift, and return to the job site. And sometimes each shift had a company van for their transportation.

At times, Defendant would place its drivers/technicians on call and pay them their regular rate of pay for time spent on call at the hotel. It would also pay them their regular rate of pay for their commute time to the job site. According to Defendant, it did not include either on call time (also known as "standby time") or commuting time (also known as "drive time") in its overtime pay calculations, but it would include some on call time in its overtime calculations if the employee was on "standby" at the job site or working in Defendant's "yard performing various tasks."

Plaintiffs Juan Segovia and Victor Flores commenced this action by filing an *Original Complaint – Collective Action* (ECF No. 1) with consents to join (ECF Nos. 1-2 and 1-3) in December 2017. They later moved for conditional certification under 29 U.S.C. § 216(b) and relied on a two-step approach utilized in *Lusardi v. Xerox, Corp.*, 118 F.R.D. 351 (D. N.J. 1987). *See ECF No. 44*. They sought conditional certification of "All Drivers and/or Frack Fuel Technicians since December 8, 2014." *See id*. at 2. On December 10, 2018, the assigned Magistrate Judge granted Plaintiffs leave to file a second amended complaint, partially granted the motion for conditional class certification, and conditionally certified the following class in this case: "All Frack

Fuel Technicians employed by Defendant since December 8, 2014." *See Order* (ECF No. 54). The next day, Plaintiffs filed the currently operative complaint. *See Second Am. & Substituted Compl. – Collective Action* (ECF No. 55). As set out in the operative complaint, Plaintiffs bring this collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq. *See id.* ¶ 2.

Plaintiffs claim that Defendant distinguished between four time-categories for each Plaintiff or putative plaintiff – "Regular," "Overtime," "Standby," and "Drive Time" – and that Defendant only paid regular hourly rate for the latter two types. *Id.* at 4-5. They allege that the policy of paying the regular rate for "Standby" or "Drive Time" violates the FLSA, either because the time was working time that could qualify for overtime under the FLSA or because the time qualified as non-discretionary bonuses that should have been included when calculating overtime pay. *See id.* at 9-10. Specifically, they assert three claims: (1) individual overtime pay based on § 207 for "drive time" and "standby time" claims (¶¶ 50-55); (2) individual overtime pay based on § 207 for regular rate claims (¶¶ 56-61); and (3) overtime claims as a collective action claim (¶¶ 62-70).

Defendant previously moved for summary judgment on all claims. *See ECF No. 58*. The Magistrate Judge issued a Report and Recommendation, which the District Court accepted without objection. *See ECF Nos. 65 and 67*. The Magistrate Judge identified the Plaintiffs as "Frac Fuel Technicians" or "Operators" and noted that four such employees would staff a fracking wellsite. *ECF No. 65* at 2. As framed by the Magistrate Judge, "[t]he question presented by Fuelco's summary judgment motion is whether [§ 207(a)(1)] should be applied to hours listed on Plaintiffs' earning statements under the categories 'Drive Time' and 'Standby' Time." *Id.* at 4.

The Magistrate Judge found genuine disputes of material fact as to whether the hours designated under those categories qualify as work time eligible for overtime payment under the FLSA. *Id.* at 6. For standby time, the primary dispute concerned whether the time was spent at the hotel or the job site, but there was also some dispute as to the freedom employees enjoyed at the hotel.

*Id.* at 9-10 & n.2. For drive time, the Magistrate Judge found summary judgment inappropriate because (1) the parties disagreed about pre-trip inspections and (2) Defendant did not contest that Plaintiffs took turns driving and that an applicable regulation (29 C.F.R. § 785.41) arguably supports counting the time driving as work time. *Id.* at 11.

With respect to Plaintiffs' regular-rate claim, the Magistrate Judge found a genuine dispute of material fact regarding "Drive Time," but not "Standby" time. *Id.* at 6. The Magistrate Judge found no dispute as to Standby time because if the time occurred at the job site it is compensable through Plaintiffs' first claim and if the time occurred at the hotel then it is exempted under 29 U.S.C. § 207(e)(2). *Id.* at 13. Although Defendant invoked § 207(e)(1), (2), and (3) regarding Plaintiffs' claim that drive time should be included as non-discretionary bonuses and thus included in calculating their regular rate of pay used for overtime calculations, reliance on (e)(1) "clearly fails," the payments received "cannot be viewed as exempted travel-expense reimbursement under § 207(e)(2)" or otherwise fit within that provision, and there is a genuine dispute of material fact as to whether the drive time payments were discretionary under (e)(3). *Id.* at 12-14.

For the reasons stated by the Magistrate Judge, the Court granted summary judgment to Defendant regarding whether "standby" time payments are or should be included in determining the "regular rate" of pay, but otherwise denied summary judgment without prejudice to renewal of the motion after further discovery. *ECF Nos. 65 and 67.* On April 5, 2019, the Magistrate Judge partially granted a motion for approval and distribution of notice. *See Order* (ECF No. 69). At that point, three additional employees had filed consents to opt in. *See ECF Nos. 5, 17, 64.* Thereafter, numerous individuals filed consents to join this collective action as Opt-in Plaintiffs, *see ECF Nos. 70-71, 73-91, 94-96*, the Magistrate Judge issued a *Phase II Scheduling Order* (ECF No.100) used in these types of collective actions, and the case has proceeded in accordance with such scheduling order as periodically amended.

In August 2019, the case was reassigned to the undersigned who continued the reference of all pretrial matters to the Magistrate Judge. *See ECF Nos. 101-02*. On April 15, 2020, the Magistrate Judge granted an unopposed motion to consolidate by Fuelco and thus consolidated this case with Case No. SA-19-CV-1129-JKP for all pretrial purposes, "but such consolidation is without prejudice to the right of any party to request a separate trial of any issue, claim, or counter-claim in the case." *See Order Consolidating Cases* (ECF No. 106). Thereafter, six consents were subsequently withdrawn. *See ECF Nos. 109-12*.

On October 26, 2020, the Magistrate Judge issued an *Amended Phase II Scheduling Order* (ECF No. 116) to set various deadlines, including one for filing a motion for decertification (December 4, 2020) and one for motions for summary judgment (forty-five days after ruling on motion for decertification). The next month, the Magistrate Judge set a briefing schedule and extended the deadline for a decertification motion to December 18, 2020. *See ECF No. 119*.

On December 18, 2020, Defendant timely filed its motion for decertification ECF No. 120 with a separate appendix (ECF No. 121). Plaintiffs filed their response (ECF No. 124) with delayed exhibits (ECF No. 125). After Defendant filed a reply brief (ECF No. 126) with a separate appendix (ECF No. 127), the Magistrate Judge returned the case to the undersigned because all pretrial matters were complete. *See ECF No. 128*.

## II. FLSA SUMMARY

"The FLSA ordinarily requires employers to pay overtime to employees who work in excess of forty hours per week." *White v. U.S. Corr., LLC*, 996 F.3d 302, ___, No. 19-51074, 2021 WL 1732132, at *3 (5th Cir. May 3, 2021) (citing 29 U.S.C. § 207(a)(1)). Violating the overtime provisions subjects the employer to liability for "unpaid overtime compensation" and "liquidated damages." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 379 (5th Cir. 2019) (quoting 29 U.S.C. § 216(b)). Furthermore, the FLSA defines "regular rate" as including "all

remuneration for employment paid to, or on behalf of, the employee," unless specifically excepted, in eight subparagraphs. *See* 29 U.S.C. § 207(e). The first three of these exceptions were addressed in the prior *Report and Recommendation* (ECF No. 65) issued in this case.

Although an employer may be exempt from the overtime provisions, *White*, 996 F.3d at ___, 2021 WL 1732132, at *3 (citing 29 U.S.C. § 213), no exemption is put at issue through the motion now before the Court. But the motion does place non-compensability matters at issue. Under the Portal-to-Portal Act of 1947, 29 U.S.C. § 254(a), certain activities are not compensable under the overtime provisions of the FLSA unless compensable by contract or custom. Absent a contract or custom, which are not placed at issue by the briefing before the Court, neither "traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" nor "activities which are preliminary to or postliminary to said principal activity or activities" are compensable so long as the activities "occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a).

"Congress amended the Portal-to-Portal Act in 1996 with the passage of the Employment Commute Flexibility Act ('ECFA'), which clarifies the applicability of the Portal-to-Portal Act to the payment of wages to employees who use employer-provided vehicles." *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 409 (5th Cir. 2011) (per curiam).[3] The ECFA added the following sentence to the end of § 254(a):

> For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting

---

[3] In *Chambers*, the Fifth Circuit expressly adopted the district "court's reasoning and holdings and attached a copy of the lower court's decision that provided "a clear, comprehensive, and correctly reasoned analysis," which was specifically incorporated by the affirmance. 428 F. App'x at 401-02 & n.1.

area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

*Id.* at 409-10. No one has urged the applicability of this portion of § 254(a).

Section 254(a) "is primarily concerned with defining the beginning and end of the work-day." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 38 (2014) (Sotomayor, J., concurring). And it invites consideration of the "continuous workday rule." Under that rule, "'workday' is generally defined as 'the period between the commencement and completion on the same workday of an employee's principal activity or activities.'" *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29 (2005) (quoting 29 C.F.R. § 790.6(b)). The continuous workday begins with "the employee's first principal activity" and ends with "the employee's last principal activity." *Chambers*, 428 F. App'x at 422 (quoting *Alvarez*, 546 U.S. at 37). And *Alvarez* held "that any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under" the FLSA. 546 U.S. at 37. Furthermore, any non-compensable activities undertaken during this continuous workday are compensable under the FLSA. *See id.*

The Supreme Court has held "that an activity is integral and indispensable to the principal activities that an employee is employed to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Busk*, 574 U.S. at 37. Under *Busk*, "whether an activity is integral and indispensable to an employee's principal activities does not turn on whether the activity benefits the employer or whether the employer requires the activity." *Bridges v. Empire Scaffold, LLC*, 875 F.3d 222, 227 (5th Cir. 2017). Courts apply the integral-and-indispensable test to all time outside the regular work shift, including both "standby" time, *see id.* at 228 (addressing pre-shift wait time), and time spent driving or riding to work, *Pittard v. Red River Oilfield Servs., LLC*, No. 4:15-CV-3753, 2017 WL 6498336, at *2-3 (S.D. Tex. Dec. 15, 2017).

Nevertheless, "even if an activity might otherwise be compensable," courts may disregard de minimis activities that merely concern "a few seconds or minutes of work beyond the scheduled working hours." *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448, 454 (5th Cir. 2009) (per curiam) (citation and internal quotation marks omitted). For instance, because "obtaining standard tool bags" that are "located in easily accessible cabinets near [the employees'] lockers"; engaging in a process that normally takes seconds, such as "clocking in and out"; and "donning and doffing generic safety gear (e.g., hearing and eye protection)" all involve "a de minimis amount of time," they are "non-compensable activities under the FLSA." *Id*.

The de minimis rule has been incorporated into applicable regulations. *See Chambers*, 428 F. App'x at 414-15.

> In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47 (citations omitted). The regulation cites with approval a "holding that 10 minutes a day is not de minimis." *Id*. And "[m]ost courts have found daily periods of approximately 10 minutes *de minimus* [sic] even though otherwise compensable." *Von Friewalde*, 339 F. App'x at 454 (quoting *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984)). Not only is "the aggregate amount of compensable time" relevant to "determining whether otherwise compensable time is *de minimis*, but" courts also consider "the practical administrative difficulty of recording the additional time" and "the regularity of the additional work." *Stuntz v. Lion Elastomers, LLC*, 826 F. App'x 391, 399 (5th Cir. 2020) (quoting *Rutti v. Lojack Corp.*, 596 F.3d 1046, 1057 (9th Cir. 2010)).

### III. MOTION FOR DECERTIFICATION

Section 216(b) of Title 29 of the United States Code permits employees to bring an FLSA action against their employer on "behalf of himself or themselves and other employees similarly situated." That provision further states that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." Unlike class actions pursued under Fed. R. Civ. P. 23, which require plaintiffs to "'opt-out' of the class," an FLSA collective action requires plaintiffs to "'opt-in' to become part of the class." *Hernandez v. Pritchard Indus. (Sw.), LLC*, No. SA-20-CV-00508-XR, 2021 WL 1146005, at *1 (W.D. Tex. Mar. 25, 2021); *accord Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir.1995) (making same observation in context of ADEA action that explicitly incorporates § 216(b)), *overruled in part on other grounds as recognized in Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 n.10 (5th Cir. 2004) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)).

"The purpose of allowing this type of action is to serve the interest of judicial economy and to aid in the vindication of plaintiffs' rights." *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008) (citations and internal quotation marks omitted). Indeed, collective actions allow "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources" while also benefitting the judicial system "by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [wrongful] activity." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

Until the Fifth Circuit decided *Swales v. KLLM Transport Services, LLC*, 985 F.3d 430 (5th Cir. 2021) in January, some district courts in the Fifth Circuit utilized the two-tiered approach for determining whether to certify a collective action set out in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). *See Mooney*, 54 F.3d at 1213-14; *Hernandez*, 2021 WL 1146005, at *1. The

first step of the *Lusardi* approach addresses notice to potential members of the collective action based on a conditional certification, which upon filing of a later motion to decertify, would be subject to a more rigorous factual determination as to whether original Plaintiffs and the Opt-in Plaintiffs are similarly situated. *See* 118 F.R.D. at 353-54.

This case has proceeded through the typical two-tiered approach and the Court now faces a motion to decertify. Between the filing of the motion and its resolution, the Fifth Circuit "reject[ed] *Lusardi*'s two-step certification rubric" for courts under its province. *Swales*, 985 F.3d at 434. "Instead of adherence to *Lusardi*, or any test for 'conditional certification,' a district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.' And then it should authorize preliminary discovery accordingly." *Id*. at 441. The courts should consider, "early in the case, whether merits questions can be answered collectively." *Id*. at 442. Further, when determining "whether and to whom notice should be issued in th[e] case, the district court needs to consider all of the available evidence." *Id*.

In its reply brief, Defendant relies on *Swales* to support decertification. *See Reply* at 1-3. Although in some respects "[t]here has been a significant shift in the law governing this dispute since the Court conditionally certified [this] collective action," *Badon v. Berry's Reliable Res., LLC*, No. CV 19-12317, 2021 WL 933033, at *3 (E.D. La. Mar. 11, 2021) (appeal filed Apr. 9, 2021), the current state of this case essentially remains the same as it would have been pre-*Swales*. This is so, because "[p]ost-*Swales*, the question the Court must answer now is the same question it would ask at the second stage of the *Lusardi* analysis: are Plaintiffs and Opt-Ins sufficiently 'similarly situated' such that this case should proceed on a collective basis?" *Id*.; *accord Hernandez*, 2021 WL 1146005, at *2 (quoting *Badon* for same proposition).

With respect to determining whether plaintiffs are similarly situated, Defendant urges

reliance on a statement in *Swales* that "[i]f answering this question requires a highly individualized inquiry into each potential opt-in's circumstances, the collective action would quickly devolve into a cacophony of individual actions." *Reply* at 2. Notably, Defendant misidentifies the relevant question as identified in *Swales*. The quoted text relates to a specific sub-question of similarly situated employees at issue in *Swales*, namely, "how much control the employer had over the independent contractor." 985 F.3d at 442. That issue relates to application of the economic-realities test, *see id.*, which is not at issue in this case.

The misidentification of the relevant question does not mean that the quoted text lacks any relationship to the question of whether employees are similarly situated. Through *Swales*, the Fifth Circuit endeavored to provide "a workable, gatekeeping framework for assessing, at the outset of litigation, before notice is sent to potential opt-ins, whether putative plaintiffs are similarly situated—not abstractly but actually." *Id.* at 433. In doing so, it rejected the conditional certification approach endorsed in *Lusardi* for two "interpretive first principles" that are both "binding commands on district courts" and "unequivocal." *Id.* at 434. Not only must the courts consider the text of "§ 216(b), which declares (but does not define) that only those 'similarly situated' may proceed as a collective," but they must remain mindful of "the Supreme Court's admonition that while a district court may 'facilitat[e] notice to potential plaintiffs' for case-management purposes, it cannot signal approval of the merits or otherwise stir up litigation." *Id.* (quoting *Hoffmann-La Roche*, 493 U.S. at 169).

In formulating the framework, the Fifth Circuit necessarily discussed similarly situated, determined that "the district court needs to consider all of the available evidence," including evidence related to threshold questions like whether the economics-realities test could be applied on a collective basis. *See id.* at 442. Furthermore, even though "the text of § 216(b)" does not explicitly place the burden on either side, the Fifth Circuit held that placing the burden on the Plaintiffs

"follows from the general burden that a plaintiff bears to prove her case." *Id*. at 443 n.65; *but see*, *Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 932 (5th Cir. 2005) ("Although the defendants may be correct in noting that the burden of persuasion shifts from plaintiffs (to show the merits of certification) to defendants (to show the merits of decertification), the difference is irrelevant.").[4] It further noted that this burden placement "makes sense as a practical matter as well, as a plaintiff should not be able to simply dump information on the district court and expect the court to sift through it and make a determination as to similarity." *Swales*, 985 F.3d at 443 n.65.

Although Plaintiffs have the burden "to prove that the individual class members are similarly situated," *Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 739 (W.D. Tex. 2018), the similarly situated determination is not "an opportunity for the court to assess the merits of [any] claim by deciding factual disputes or making credibility determinations," *McKnight v. D. Houston, Inc.*, 756 F. Supp. 2d 794, 802 (S.D. Tex. 2010). "After considering all available evidence," the district courts exercise their "broad, litigation-management discretion" to determine whether "the Plaintiffs and Opt-ins are too diverse a group to be 'similarly situated' . . . or at least that Plaintiffs have not met their burden of establishing similarity." *Swales*, 985 F.3d at 443. And, upon such consideration, the courts "may decide the case cannot proceed on a collective basis," find that additional discovery is necessary, or "find that only certain subcategories" of employees "should receive notice." *Id*.

As pointed out in *Swales*, factors to be considered at the second *Lusardi* step, include: "(1) [the] disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [the] defendant which appear to be individual to each plaintiff; [and] (3) fairness and

---

[4] Because *Swales* rejected the conditional certification approach used in *Lusardi* as applied earlier in this case, the Court considers whether this action should proceed as a collective action under *Swales* but considers that issue through the instant motion to decertify. In essence, the Court now considers whether the original Plaintiffs and the Opt-in Plaintiffs are similarly situated, such that they may proceed together collectively in this action. The Court thus places the burden on Plaintiffs consistent with *Swales*, rather than applying the possible burden shifting expressed in *Baldridge*.

procedural considerations." *Id.* at 437 (quoting *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)). Although *Swales* brings step-two of *Lusardi* to the forefront of FLSA collective actions, it does not alter the meaning of "similarly situated" as honed and considered through judicial decisions since the phrase first appeared undefined in the statute.

As the Fifth Circuit noted long ago, "*Lusardi* and its progeny are remarkable in that they do not set out a definition of 'similarly situated,' but rather they define the requirement by virtue of the factors considered in the 'similarly situated' analysis." *Mooney*, 54 F.3d at 1213 (citing factors in a footnote, including those identified in *Swales*). Both before and after *Swales*, courts have looked to these factors when determining whether Plaintiffs and Opt-ins are similarly situated in the context of a collective action. *Compare Badon*, 2021 WL 933033, at *3 (applying factors despite *Swales*) *with Snively*, 314 F. Supp. 3d at 739; *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014), *aff'd*, 656 F. App'x 688 (5th Cir. 2016) (per curiam); *Vanzzini v. Action Meat Distributors, Inc.*, 995 F. Supp. 2d 703, 721 (S.D. Tex. 2014) (citing several cases for principle that "courts generally consider" the listed factors). These factors overlap considerably and "are not mutually exclusive." *Snively*, 314 F. Supp. 3d at 739 (quoting *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 534 (S.D. Tex. 2008)).

Although courts err if they apply the *Lusardi* framework "when deciding whether to send notice in an FLSA collective action," once the "correct legal standard is ascertained," it is ultimately within the Court's sound discretion as to how to apply the standard. *Swales*, 985 F.3d at 439; *accord Moody*, 54 F.3d at 1213 (recognizing that "the district court's application of the [legal] standard must be reviewed for abuse of discretion"); *Vanzzini*, 995 F. Supp. 2d at 720 (noting that "whether to decertify a collective action is within a district court's discretion"). Further, as recognized in *Swales*, although "trial courts do not possess 'unbridled discretion' in overseeing collective actions and sending notice to potential opt-in plaintiffs," they do possess broad discretion

related to collective action matters, including when applying the legal standard for determining whether to permit a proposed group or subcategory of the proposed group to proceed as a collective action because the group is similarly situated. 985 F.3d at 436 (quoting *Hoffmann-La Roche*, 493 U.S. at 174).

From the statutory text, "similarly situated," as required for pursuit of an FLSA collective action, clearly differs from "identically situated." And "courts are adamant" that plaintiffs need not establish identical situations to carry their burden to show "similarly situated." *Vanzzini*, 995 F. Supp. 2d at 720 (citing cases). Instead, the pertinent inquiry is whether the plaintiffs have "demonstrated similarity among the individual situations." *Id.* They may do that by showing "some factual nexus which binds" them and opt-in plaintiffs (or potential opt-in members depending on timing of the inquiry) as alleged victims of a particular policy or practice. *Id.*; *accord Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008) (utilizing same nexus approach). Thus, "hearing the cases together furthers the purposes of [the statute], is fair to both parties, and does not result in an unmanageable trial." *Vanzzini*, 995 F. Supp. 2d at 720.

Even if there are "numerous differences between individual plaintiffs," such differences will not preclude a collective action unless they are material to ultimate issues before the trial court. *Clark*, 44 F. Supp. 3d at 688. Undoubtedly, when "one zooms in close enough on anything, differences will abound;" but courts must consider the claims asserted "at a higher level of abstraction." *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 226 (5th Cir. 2011) (per curiam) (quoting *Frank v. Gold'n Plump Poultry, Inc.*, No. 04-CV-1018, 2007 WL 2780504, at *4 (D. Minn. 2007)). In other words, while courts take "care in evaluating distinctions among employees," they must also recognize that, for an identified distinction to be material, it "must make a difference relevant to the legal issues presented." *Id.*

"If the Court determines the plaintiffs are similarly situated, the collective action

proceeds." *Snively*, 314 F. Supp. 3d at 738-39. But if Plaintiffs fail to carry their burden to show "that the individual class members are similarly situated," the Court will find that they are not similarly situated, dismiss them "without prejudice to bringing their own actions," and permit the original plaintiffs to "proceed with their individual claims." *Id*. at 739.

## A. <u>Factual and Employment Settings of Plaintiffs</u>

As described by Defendant, "[t]his is an FLSA overtime case about whether commute time (or on-call time to a much lesser degree) is compensable." *Mot*. at 1. It argues that such inquiry requires delving into specific facts for each employee and maintains that this case does not involve the application of any common policy, plan, pattern, or practice. *Id*. at 1-2. Plaintiffs and the Opt-in Plaintiffs contend that they are "nearly identically situated with respect to the critical issues in this case." *See Resp*. at 1. Alternatively, they contend that if the Court views the existing variations meaningful, it may create appropriate subclasses to resolve the variances. *See id*. at 1-2. Including the two original Plaintiffs, Defendant proceeds as though fifty-eight employees have consented to opt into this action. *See Mot*. at 8-9; *Reply* at 4. The Court has no reason to doubt that number and Plaintiffs have not contested it in their response to the motion.

Defendant focuses on differences between the various employees who have joined this action. Plaintiffs downplay those differences and focus on their similarities. Although Defendant adamantly argues that this collective action "<u>does not</u> involve the application of a 'common policy, plan, pattern, or practice,'" *see Mot.* at 1, the Court finds the payment practices or policies of Defendant common among its employees who have joined this action. In this case, Plaintiffs and the Opt-ins share a highly similar employment setting, with each employee performing the same or essentially the same work under the same set of supervisors subject to the same pay provisions and policies or practices. Defendant housed each employee at a hotel near the job sites due to the remote location of the sites and the duration of each job project. Each employee either drove or

rode in the company van to and from work. Defendant uniformly compensated each employee at an hourly rate under a uniform policy or practice that neither drive time nor standby time qualified for overtime wages. Furthermore, no one disputes that each Plaintiff falls within the category of employees conditionally certified in December 2018.

When addressing this first factor regarding whether Plaintiffs are similarly situated, the courts consider "the opt-in plaintiffs' job duties, geographic location, supervision, and salary." *Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 739 (W.D. Tex. 2018) (citation omitted). These matters support finding the Opt-in Plaintiffs similarly situated to the original Plaintiffs.

Differences do begin to emerge the more closely one examines the employees and the claims asserted in this action. Both sides concede that whether employees performed pre-trip duties is the primary issue with respect to the drive time claim asserted in this action. Similarly, whether employees performed post-trip duties is likewise a significant issue to that claim. And, as pointed out by the Magistrate Judge in considering the prior motion for summary judgment, whether an employee was driving the company van appears relevant. The main issue with whether standby time is compensable is where the time occurred, with a secondary focus on how much freedom the employees enjoyed while on "standby." And, with respect to Plaintiffs' regular-rate claim, the sole remaining issue seems to be limited to whether drive time payments were discretionary under § 207(e)(3).

With respect to the asserted regular-rate claim, whether drive time payments were discretionary appears to transcend any individual differences between Plaintiffs. Likewise, with respect to the compensability of time spent on "standby," how much freedom employees enjoyed while on standby would be similar for all Plaintiffs. And, even though some Plaintiffs may differ in where they were when they were designated as "standby" or what activity was allegedly performed during the "standby" time, they appear sufficiently similarly situated to pursue the standby claim

collectively.

Although Defendant points to several differences regarding whether drive time is compensable, the key to such claim is when the workday begins and ends for each joined employee. For each employee, the workday begins with the employee's first principal activity and ends with his or her last principal activity. Because all Plaintiffs were employed to perform the same or similar jobs, each Plaintiff would have the same or similar principal activities. Moreover, as the Southern District of Texas has recognized, "the question is not whether Plaintiffs all have the same exact work day," but rather "whether they are all subjected to a common policy, plan, or practice—the same factual and employment settings." *Serrano v. Republic Servs., Inc.*, No. 2:14-CV-77, 2017 WL 2531918, at *19 (S.D. Tex. June 12, 2017) (citing *Vanzzini*, 995 F. Supp. 2d at 722-23). And, in this instance, all Plaintiffs were subjected to such a policy or practice.

Variations of a particular workday or variations between employees "go to the magnitude of the effect of the common decision on individual [employees] rather than undermining the fact that it was a common policy, plan, or practice that affected them all." *Id*. Moreover, "[v]ariations in the quantity of time lost as uncompensated goes to damages, not liability." *Id*. When plaintiffs' "common issues predominate over individual damage calculations," class certification is proper, and the plaintiffs may proceed in a collective action. *See id*. (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452-53 (2016) (applying Fed. R. Civ. P. 23 class action certification principles in FLSA case and finding variations in individual damages do not prevent certification)).

Defendant provides a Venn diagram showing a range of circumstances that Plaintiffs use to assert that their "standby" time is compensable, including downtime at the job site, time at Defendant's yard, time spent in non-commute driving, time unloading the van, and work from hotel. *Reply* at 2. It provides similar Venn diagrams showing pre- and post-commute activities relied upon by Plaintiffs to assert that their drive time is compensable, including loading and

unloading, vehicle inspections and cleaning, safety meetings, and paperwork. *Id*. at 3. Relying on these differences, it argues that "[t]his case is a prime example of the situation the Fifth Circuit wants to avoid with the new framework in *Swales*." *Id*.

First, Defendant misinterprets the scope of the changes set out in *Swales*. As mentioned previously, *Swales* did not change the inquiry as to whether an FLSA action may proceed as a collective action. It instead changed when that determination should be made. This case is now at the second step of *Lusardi*, which under *Swales* would be the first step taken early in the case. The changed timing of the inquiry does not affect what courts examine when making their collective action determinations. The Court must look at all the evidence to determine whether Plaintiffs are similarly situated. Because extensive discovery has taken place in this case, the Court has much more information than is generally available when making the same determination at the outset of a case. But that does not mean that every uncovered difference between Plaintiffs is relevant to the ultimate determination or that the differences preclude Plaintiffs from pursuing the action collectively. While Defendant points to dissimilarities between the Plaintiffs, the Court finds the similarities of their factual and employment settings support proceeding as a collective action.

## B. Individual Defenses

With respect to alleged individual defenses, Defendant essentially takes the position that time claimed as overtime is simply not compensable. In its reply brief, Defendant concisely states that it "did not pay overtime for commute time, because it is not compensable under the FLSA (for regular time or overtime)." *Reply* at 4. This reason applies to every Plaintiff in this action. Defendant goes on to state that commute time "is only compensable if a Plaintiff engaged in actual work (for more than a *de minimis* period) before and/or after such commute." *Id*. Again, this reasoning applies to all Plaintiffs. Nevertheless, Defendant argues that Plaintiffs are not similarly situated because some members lack a viable claim. *Id*. at 5 (relying on *Rindfleisch v. Gentiva Health*

*Servs.*, 22 F. Supp. 3d 1295, 1303 (N.D. Ga. 2014)).

Even though a "defense may require specific factual inquiries about each Plaintiff," when the Defendant asserts the defense against each Plaintiff, "collective treatment is less problematic." *Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 742 (W.D. Tex. 2018). The Court, of course, has broad discretion as to certification matters. And, while that discretion may encompass denying permission for an FLSA action to proceed as a collective action because some members lack a viable claim, exercising such discretion in that manner is not mandated and the Court finds such a denial unwarranted under the facts here. Although, when considering whether an FLSA case can proceed as a collective action, courts may consider whether a merits question "can be answered collectively," *Swales v. KLLM Transp. Servs., LLC*, 985 F.3d 430, 442 (5th Cir. 2021), they "cannot signal approval of the merits," *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989). Moreover, when "the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—[an alleged] failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016) (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 107 (2009)).

The fact that Defendant previously moved for summary judgment on all claims in this action cuts against its arguments of individualized defenses. But the Court does recognize that numerous plaintiffs opted in after that first summary judgment motion. Furthermore, under the circumstances of this case, i.e., pre-*Swales*, Defendant could have remedied some of argued dissimilarities by moving for summary judgment on claims that it views as lacking evidentiary support or involving mere de minimis work time. Interestingly, had the *Swales* framework existed when this case was filed, the Court would have conducted its collective action determination without all the evidence that has been gathered in this case's lengthy history. Under the new framework, courts

19

typically will not have the extensive evidentiary record that is available in this case. In any event, even in a collective action, defendants may obtain dismissal of specific claims of specific plaintiffs that are not supported by the evidence.

For these reasons, the Court finds the alleged individual defenses to be mostly globally applicable across Plaintiffs. And to the extent there are individual defenses that apply to specific Plaintiffs or categories of Plaintiffs, such defenses carry less weight than the global defenses and the similarities of the Plaintiffs as addressed in the immediately preceding section. Even if Defendant must pose an inquiry to each of the fifty-eight Plaintiffs, the Court does not see how doing so "in one collective trial is any less difficult" than posing the same inquiry in separate trials. *See Snively*, 314 F. Supp. 3d at 742.

## C. <u>Fairness and Procedural Considerations</u>

The Court next considers matters of fairness and procedure. For these matters, courts consider "the primary objectives" of FLSA collective actions – "(1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity." *Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 743 (W.D. Tex. 2018) (citation omitted). Another pertinent consideration is whether the Court "can coherently manage the class in a manner that will not prejudice any party." *Id*. (quoting *Mahoney v. Farmers Ins. Exch.*, No. 4:09-CV-2327, 2011 WL 4458513, at *10 (S.D. Tex. Sept. 23, 2011)).

While the size of the proposed collective action is not small, at fifty-eight plaintiffs it is not unwieldy either. At this juncture, the Court is confident that it can manage the class in a manner to avoid prejudice to either party even were it ultimately tried to a jury. But, for this case and the consolidated action, the docket sheets reflect that the cases are set for "bench trial, which provides flexibility in juggling a potentially complex case." *See id*. The Court also has discretion under Fed.

R. Civ. P. 21 to "drop a party" on terms that are just and to "sever any claim against a party." Additionally, Fed. R. Civ. P. 42(b) permits courts to order separate trials "[f]or convenience, to avoid prejudice, or to expedite and economize."

Further, the Court agrees with Eastern District of Louisiana that "to decertify the class at this time would require refiling, joinder or consolidation, and additional pleadings," all of which "would be inefficient and serve no useful purpose," at this late point in the litigation. *See Hernandez v. Morning Call Coffee Stand, Inc.*, No. CV 17-2613, 2018 WL 3391593, at *3 (E.D. La. July 12, 2018). As noted in a prior footnote, because *Swales* has changed the legal landscape regarding conditional certification in the Fifth Circuit, the Court is presently considering whether this action should proceed as a collective action through the pending motion to decertify. But that does not change the fact that, since December 2018, this action has proceeded as a conditionally certified collective action. During that time, the parties have engaged in extensive discovery.

And, on the record before the Court, decertification at this point (or declining to permit this action to proceed as a collective action as the case may be) would be more unfair to Plaintiffs than any potential unfairness to Defendant should Plaintiffs be allowed to continue their pursuit of this case as a collective action. Further, the Court finds it more efficient for all parties and the Court to permit this action to continue as a collective action.

The Court, moreover, has broad discretion as to certification matters and the procedures to apply in collective actions. Plaintiffs have suggested that subclasses can address potential prejudice to Defendant. The Court agrees that the creation of subclasses should help Defendant address the matters it needs to address on summary judgment and at trial. Subclasses may also aid in the manageability of this collective action. Accordingly, the Court directs the parties to confer and discuss the creation of subclasses. And to the extent possible, they shall submit a joint stipulation as to the precise members of each subclass and how the subclass is defined. If the parties cannot

21

fully agree on how to define the subclasses or the members of each subclass, their joint stipulation should address the matters that they can agree about. For disagreements, the parties may submit individual proposals, which the Court will consider.

If, after further consideration, Plaintiffs realize that one or more Opt-in Plaintiffs lack an actual claim, Plaintiffs may, in accordance with Fed. R. Civ. P. 41(a)(1)(A)(ii), file "a stipulation of dismissal signed by all parties who have appeared." Such stipulation will dismiss the claims of such individual Plaintiffs without affecting the pursuit of the collective action by the other Plaintiffs. And if Defendant does not agree to such a dismissal, Plaintiffs may move for the dismissal of an individual Plaintiff under Fed. R. Civ. P. 41(a)(2). In addition, the filing of a withdrawal of consent to join this action may suffice.

Furthermore, it is within the Court's discretion to permit this collective action to proceed while also permitting "individualized evidence through testimony to the jury or deposition excerpts to the court." *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 227 (5th Cir. 2011) (per curiam). In *Roussell*, the Fifth Circuit found that fifty-five "separate trials would not have been justifiable under [Fifth Circuit] FLSA caselaw" because "collective actions are intended 'to avoid multiple lawsuits where numerous employees have allegedly been harmed by a claimed violation or violations of the FLSA by a particular employer.'" *Id*. (quoting *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 919 (5th Cir. 2008)). Accordingly, it held that that "suit validly proceeded as a collective action." *Id*.

For complex cases, such as an FLSA collective action, the district courts must "develop a plan" and review of such plan "is deferential because 'the trial judge is in a much better position than an appellate court to formulate an appropriate methodology for a trial.'" *Id*. (quoting *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1018 (5th Cir. 1997)). At this point in the litigation, it appears fair to permit Defendant to pursue motions for summary judgment against individual Plaintiffs,

subclasses of Plaintiffs as created through the joint efforts of the parties or otherwise created by the Court, or against the collective action as a whole. If there are deficiencies in some Plaintiffs' proof, Defendant should challenge such deficiencies through the summary judgment process rather than the certification (or decertification) process. As recognized by the Supreme Court, Plaintiffs claiming uncompensated work must carry their burden to prove that they have performed work for which they were improperly compensated and produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016) (citation omitted). Notably, a dismissal on summary judgment would be with prejudice whereas decertifying this collective action or not permitting certain Plaintiffs to participate would result in dismissals without prejudice.

**D. Summary**

Taking an appropriate abstract view of the employees, the Court finds that the original Plaintiffs and the Opt-in Plaintiffs are similarly situated, and this case may proceed as a collective action. Plaintiffs have shown a factual nexus that binds the original Plaintiffs and the Opt-in Plaintiffs as alleged victims of a specific policy or practice to not pay overtime wages for drive time or standby time. Allowing the employees to pursue their claims together furthers the purpose of the FLSA overtime provisions. And collective pursuit of the cases appears fair to both sides and does not make trial unmanageable. While there are some differences between employees, such as what each employee did or did not do pre- and post-driving, the differences do not affect whether the employees are similarly situated.

**IV. CONCLUSION**

For the foregoing reasons, the Court **DENIES** *Defendant Fuelco's Motion for Decertification of Collective Action* (ECF No. 120). In doing so, the Court affirmatively conducts the similarly situated analysis in accordance with the recent Fifth Circuit decision that rejected the two-step

conditional certification approach applied earlier in this case. *See Swales v. KLLM Transp. Servs., LLC*, 985 F.3d 430 (5th Cir. 2021). Naturally, because this case proceeded under a conditional certification for more than two years before the *Swales* decision, the Court could not simply ignore the historical conditional certification when making its determination as to whether the original Plaintiffs and the Opt-in Plaintiffs are similarly situated and thus may proceed collectively.

The Magistrate Judge previously set a deadline for any dispositive motion at forty-five days from the date of this ruling. **On or before June 25, 2021**, the parties shall submit the joint stipulation as to sub-classes and any individual proposals that the parties want the Court to consider. Given this deadline and the complexity of this collective action, the Court extends the dispositive motion deadline to **August 24, 2021**.

IT is so ORDERED.

SIGNED this 28th day of May 2021.

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**