## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

**JUAN SEGOVIA and VICTOR FLORES,**
**on behalf of themselves and all others**
**similarly situated,**

      *Plaintiffs*,

**v.**                                      **Case No. SA-17-CV-1246-JKP**

**FUELCO ENERGY LLC,**                  **(Consolidated with**
                                        **Case No. SA-19-CV-1129-JKP)**

      *Defendant*.

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are five motions for summary judgment (ECF Nos. 138, 139, 140, 141, 142) filed by Defendant Fuelco Energy LLC concerning various aspects of this collective action that Plaintiffs pursue under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq. Plaintiffs claim that Defendant has not paid them overtime owed.

The first motion seeks dismissal of Plaintiffs' rate of pay claims and "the portion of Plaintiffs' FLSA claim that is based upon time spent commuting to the jobsite" for the first of four subclasses of employees in this collective action – (1) employees who conducted pre-trip inspections. *See* ECF No. 138 at 1. The next three motions seek dismissal of that part of the FLSA claim that is based upon commuting to the jobsite for the other three subclasses of this collective action – (2) employees who did not conduct pre-trip inspections, *see* ECF No. 139 at 1-2; (3) employees who conducted post-trip inspections, *see* ECF No. 140 at 1-2; and (4) employees who did not conduct post-trip inspections, *see* ECF No. 141 at 1-2. The fifth motion concerns Plaintiffs' FLSA claims for standby or on-call time. *See* ECF No. 142.

With Plaintiffs' responses (ECF Nos. 150, 151, 152, 153, 154) and Defendant's com-

bined reply (ECF No. 158), the motions are ripe for ruling. Both sides have submitted evidence.[1]

After considering the motions, related briefing, relevant evidence, and applicable law, the Court

partially grants the first four motions and denies the fifth motion as stated herein.

## I. GENERAL AND PROCEDURAL BACKGROUND[2]

As a fuel supplier for gas production companies, Defendant employs individuals to pro-

vide fuel for customers at their gas hydraulic fracturing sites ("well site").[3] On a typical well site,

Defendant assigns two fuel trucks (known as "bobtails"), each with a two-person crew – a driver

and an operator or technician. Defendant would thus have a four-member crew for both twelve-

hour shifts (night and day). Therefore, there is typically a crew of eight for each site. Each bob-

tail remains on site for the duration of the job. Crew members work together to provide fuel to

equipment at the site.

Given the nature of the well sites – often located in remote areas – and the lengthy nature

of each job project, Defendant lodges its crews at the nearest hotel or at a "man-camp" (collec-

tively referred to as "hotel") for the duration of the project. Defendant would provide a van or

truck (collectively referred to as "van") to transport crews between the hotel and well sites. Usu-

ally, both shifts would use the same van with one shift using it to travel to the well site and the

---

[1] Defendant has filed an Appendix, which is contained within two filings due to its extensiveness. *See* ECF Nos. 143 and 144. It also relies on previously submitted appendices. *See* ECF Nos. 58-1 to 58-12, 121, 121-1 to 121-6, and 127. Plaintiffs attach three appendices (A, B, and C) to their response to Defendant's first motion for summary judgment. *See* ECF No. 150-1 (App A), 150-2 (App. B), and 150-3 (App. C). For ease of reference, the Court will cite to Defendant's most recent appendix as "App." and to Plaintiffs' appendices by letter, i.e., App. A, etc. It will cite to other appendices by ECF No.

[2] Much of this section is taken from the Court's prior Memorandum Opinion and Order denying decertification. The Court restates it to put the motions for summary judgment in proper context. Unless noted otherwise, the facts stated are uncontested.

[3] "Hydraulic fracturing is a technique in which a liquid is injected under high pressure into a well in order to create tiny fissures in the rock deep beneath the earth which then allow gas and oil to flow into the well." *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/fracking (last visited September 23, 2022). This technique is often referred to as "fracking." *See id.* While those in the gas and oil industries often use "fraccing" or "fracing," Merriam-Webster has accepted "fracking" as the most appropriate spelling. *See id*. The Court will utilize the k-version of "fracking" and any variation of the term. Furthermore, the Court will use "well site" to refer to customer job sites.

departing shift using it to return to the hotel. Sometimes, a member of the working crew would drive to the hotel from the well site, pick up the next shift, and return to the site. And sometimes each shift had a company van for their transportation.

At times, Defendant would place its drivers/technicians on call and pay them their regular rate of pay for time spent on call at the hotel. It would also pay them their regular rate of pay for their commute time to the well site. According to Defendant, it did not include either on call time (also known as "standby time") or commuting time (also known as "drive time") in its overtime pay calculations, but it would include some on call time in its overtime calculations if the employee was on "standby" at the well site or working in Defendant's "yard performing various tasks."

Plaintiffs Juan Segovia and Victor Flores commenced this action by filing an *Original Complaint – Collective Action* (ECF No. 1) with consents to join (ECF Nos. 1-2 and 1-3) in December 2017. They later moved for conditional certification under 29 U.S.C. § 216(b) and relied on a two-step approach utilized in *Lusardi v. Xerox, Corp.*, 118 F.R.D. 351 (D. N.J. 1987). *See* ECF No. 44. They sought conditional certification of "All Drivers and/or Frack Fuel Technicians since December 8, 2014." *See id.* at 2. On December 10, 2018, the assigned Magistrate Judge granted Plaintiffs leave to file a second amended complaint, partially granted the motion for conditional class certification, and conditionally certified the following class in this case: "All Frack Fuel Technicians employed by Defendant since December 8, 2014." *See Order* (ECF No. 54). The next day, Plaintiffs filed the currently operative complaint. *See* Second Am. & Substituted Compl. – Collective Action (ECF No. 55) ("SAC"). As set out in the operative complaint, Plaintiffs bring this collective action under the FLSA. *See id.* ¶ 2. Defendant characterizes this action as "essentially alleging that [Plaintiffs] were underpaid by a few hundred dollars." *See* ECF No. 138 at 3. But it is also apparent that both sides view matters quite differently.

3

Plaintiffs claim that Defendant distinguished between four time-categories for each Plaintiff or putative plaintiff – "Regular," "Overtime," "Standby," and "Drive Time" – and that Defendant paid only the regular hourly rate for the latter two types. SAC at 4-5. They allege that the policy of paying the regular rate for "Standby" or "Drive Time" violates the FLSA, either because the time was working time that could qualify for overtime under the FLSA or because the time qualified as non-discretionary bonuses that should have been included when calculating overtime pay. *See id.* at 9-10. Specifically, they assert three claims: (1) individual overtime pay based on 29 U.S.C. § 207 for "drive time" and "standby time" claims (¶¶ 50-55); (2) individual overtime pay based on § 207 for regular rate claims (¶¶ 56-61), based on a violation of 29 C.F.R. § 778.208 by "not including non-discretionary bonuses paid to Plaintiffs in their regular rate when calculating their overtime pay"; and (3) overtime claims as a collective action claim (¶¶ 62-70).

Defendant previously moved for summary judgment on all claims. *See* ECF No. 58. The Magistrate Judge issued a Report and Recommendation ("R&R"), which the District Court accepted without objection. *See* ECF Nos. 65 and 67. The Magistrate Judge identified the Plaintiffs as "Frac Fuel Technicians" or "Operators" and noted that four such employees would staff a fracking well site. R&R at 2. As framed at that time, the question presented through the summary judgment motion was whether § 207(a)(1) "should be applied to hours listed on Plaintiffs' earning statements under the categories 'Drive Time' and 'Standby' Time." *Id.* at 4.

The Magistrate Judge found genuine disputes of material fact as to whether the hours designated under those categories qualify as work time eligible for overtime payment under the FLSA. *Id.* at 6. For standby time, the primary dispute concerned whether the time was spent at the hotel or the well site, but there was also some dispute as to the freedom employees enjoyed at the hotel. *Id.* at 9-10 & n.2. For drive time, the Magistrate Judge found summary judgment inap-

propriate because (1) the parties disagreed about pre-trip inspections and (2) Defendant did not contest that Plaintiffs took turns driving and that an applicable regulation (29 C.F.R. § 785.41) arguably supports counting the time driving as work time. *Id*. at 11.

With respect to Plaintiffs' regular-rate claim, the Magistrate Judge found a genuine dispute of material fact regarding "Drive Time," but not "Standby" time. *Id*. at 6. The Magistrate Judge found no dispute as to Standby time because if the time occurred at the well site, it is compensable through Plaintiffs' first claim and if the time occurred at the hotel, then it is exempted under 29 U.S.C. § 207(e)(2). *Id*. at 13. Although Defendant invoked § 207(e)(1), (2), and (3) regarding Plaintiffs' claim that drive time should be included as non-discretionary bonuses and thus included in calculating their regular rate of pay used for overtime calculations, reliance on (e)(1) "clearly fails," the payments received "cannot be viewed as exempted travel-expense reimbursement under § 207(e)(2)" or otherwise fit within that provision, and there is a genuine dispute of material fact as to whether the drive time payments were discretionary under (e)(3). *Id*. at 12-14.

For the reasons stated by the Magistrate Judge, the Court granted summary judgment to Defendant regarding whether "standby" time payments are or should be included in determining the "regular rate" of pay, but otherwise denied summary judgment without prejudice to renewal of the motion after further discovery. ECF Nos. 65 and 67. Thus, standby time is no longer an issue to the extent it relates to Plaintiffs' regular rate claim.

On April 5, 2019, the Magistrate Judge partially granted a motion for approval and distribution of notice. *See* Order (ECF No. 69). At that point, three additional employees had filed consents to opt in. *See* ECF Nos. 5, 17, 64. Thereafter, numerous individuals filed consents to join this collective action as Opt-in Plaintiffs, *see* ECF Nos. 70-71, 73-91, 94-96, the Magistrate

Judge issued a Phase II Scheduling Order (ECF No.100) used in these types of collective actions, and the case has proceeded in accordance with such scheduling order as periodically amended.

In August 2019, the case was reassigned to the undersigned who continued the reference of all pretrial matters to the Magistrate Judge. *See* ECF Nos. 101-02. On April 15, 2020, the Magistrate Judge granted an unopposed motion to consolidate by Fuelco and thus consolidated this case with Case No. SA-19-CV-1129-JKP for all pretrial purposes, "but such consolidation is without prejudice to the right of any party to request a separate trial of any issue, claim, or counter-claim in the case." *See* Order Consolidating Cases (ECF No. 106). Thereafter, six consents were subsequently withdrawn. *See* ECF Nos. 109-12.

The Court later denied a motion to decertify, and in doing so, it considered whether this action should proceed as a collective action. *See* ECF No. 129 at 12 n.4, 21. After considering the various relevant factors, the Court found "that the original Plaintiffs and the Opt-in Plaintiffs are similarly situated, and this case may proceed as a collective action." *Id*. at 23. The Court thereafter held a status conference and set out various deadlines to control this case. *See* ECF Nos. 132, 135. In accordance with the order of the Court, Defendant filed its five motions for summary judgment. As aptly explained by Defendant, each plaintiff in this case has membership in two subclasses. ECF No. 138 at 5. The existence of "any evidence of a pre-trip inspection places" a plaintiff in Subclass 1, otherwise they are in Subclass 2. *Id*. Similarly, "any evidence of a post-trip inspection places" a plaintiff in Subclass 3, otherwise they are in Subclass 4. *Id*. The fifth motion addresses Plaintiffs' claims for standby or on-call time. ECF No. 142.

There are currently "approximately fifty-eight (58) plaintiffs and opt-in plaintiffs in this case." *See* ECF No. 138 at 4. Forty-one of these employees fall within Subclass 1, *id*. at 7, meaning that seventeen fall with Subclass 2, *see* ECF No. 139 at 1. Subclass 3 has fifteen members, *see* ECF No. 140 at 1, which means that Subclass 4 has forty-three even though the motion ad-

dressing the fourth subclass initially says seventeen members, *see* ECF No. 141 at 1 (the reference to seventeen appears to be holdover language from ECF No. 139), 5 (referring to forty-three members of Subclass 4).

While recognizing that each workday potentially differs for each work crew of the Plaintiff employees, the Court will treat a typical workday as a twelve-hour shift. And it will refer to Plaintiffs in the following generic ways – "morning driver" to refer to the Plaintiff driving from the hotel to the jobsite; "evening driver" to refer to the Plaintiff driving from the jobsite back to the hotel, and all non-driver Plaintiffs for each trip as morning or evening riders.

## II. FLSA OVERVIEW

"The FLSA ordinarily requires employers to pay overtime to employees who work in excess of forty hours per week." *White v. U.S. Corr., LLC*, 996 F.3d 302, 307 (5th Cir. 2021) (citing 29 U.S.C. § 207(a)(1)). Violating the overtime provisions subjects the employer to liability for "unpaid overtime compensation" and "liquidated damages." *Parrish v. Premier Directional Drilling, LP*, 917 F.3d 369, 379 (5th Cir. 2019) (quoting 29 U.S.C. § 216(b)). Under the FLSA, employees who work more than forty hours in one week are entitled to receive overtime compensation "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

The FLSA, furthermore, defines "regular rate" as including "all remuneration for employment paid to, or on behalf of, the employee," unless specifically excepted, in eight subparagraphs. *See id.* § 207(e). The first three of these exceptions were addressed in the R&R (ECF No. 65) issued in this case. And Defendant continues to assert an exclusion under § 207(e)(3) for a discretionary bonus. *See*, *e.g.*, ECF No. 138 at 33-37. To qualify for such an exclusion, "the employer must retain discretion both as to the fact of payment and as to the amount until a time quite close to the end of the period for which the bonus is paid." 29 C.F.R. § 778.211. "Bonuses

which do not qualify for exclusion from the regular rate . . . must be totaled in with other earnings to determine the regular rate on which overtime pay must be based." *Id*. § 778.208.

In addition, although an employer may be exempt from the overtime provisions, *White*, 996 F.3d at 307 (citing 29 U.S.C. § 213), no § 213 exemption is at issue through the motions before the Court. But the motions do place non-compensability matters at issue. Under the Portal-to-Portal Act of 1947 ("PPA"), 29 U.S.C. § 254(a), certain activities are not compensable under the overtime provisions of the FLSA unless compensable by contract or custom. Absent a contract or custom, "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" and "activities which are preliminary to or postliminary to said principal activity or activities" are not compensable so long as the activities "occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a).

"Congress amended the Portal-to-Portal Act in 1996 with the passage of the Employment Commute Flexibility Act ('ECFA'), which clarifies the applicability of the Portal-to-Portal Act to the payment of wages to employees who use employer-provided vehicles." *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 409 (5th Cir. 2011) (per curiam).[4] The ECFA added the following sentence to the end of § 254(a):

> For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

---

[4] In *Chambers*, the Fifth Circuit expressly adopted the district "court's reasoning and holdings and attached a copy of the lower court's decision that provided "a clear, comprehensive, and correctly reasoned analysis," which was specifically incorporated by the affirmance. 428 F. App'x at 401-02 & n.1.

*Id.* at 409-10.

Notwithstanding, § 254(a) – including the ECFA addition – § 254(b) makes such activities compensable by either (1) an express contractual provision or "(2) a custom or practice . . . not inconsistent with a written or nonwritten contract." Therefore, "traveltime at the commencement or cessation of the workday which was originally considered as working time under the Fair Labor Standards Act (such as underground travel in mines or walking from time clock to work-bench) need not be counted as working time unless it is compensable by contract, custom or practice." 29 C.F.R. § 785.34. And while compensable travel time under § 254(b), "must be counted in computing hours worked . . . ordinary travel from home to work (see § 785.35) need not be counted as hours worked even if the employer agrees to pay for it." *Id.* § 785.34. Further, § 254(c) restricts subparagraph (b) to "the portion of the day with respect to which [an activity] is so made compensable."

Section 254(a) "is primarily concerned with defining the beginning and end of the workday." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 38 (2014) (Sotomayor, J., concurring). And it invites consideration of the "continuous workday rule." Under that rule, "'workday' is generally defined as 'the period between the commencement and completion on the same workday of an employee's principal activity or activities.'" *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29 (2005) (quoting 29 C.F.R. § 790.6(b)). The continuous workday begins with "the employee's first principal activity" and ends with "the employee's last principal activity." *Chambers*, 428 F. App'x at 422 (quoting *Alvarez*, 546 U.S. at 37). And *Alvarez* held "that any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under" the FLSA. 546 U.S. at 37. Furthermore, any non-compensable activities undertaken during this continuous workday are compensable under the FLSA. *See id.*

The Supreme Court has held "that an activity is integral and indispensable to the principal

activities that an employee is employed to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Busk*, 574 U.S. at 37. Under *Busk*, "whether an activity is integral and indispensable to an employee's principal activities does not turn on whether the activity benefits the employer or whether the employer requires the activity." *Bridges v. Empire Scaffold, LLC*, 875 F.3d 222, 227 (5th Cir. 2017). Courts apply the integral-and-indispensable test to all time outside the regular work shift, including both "standby" time, *see id*. at 228 (addressing pre-shift wait time), and time spent driving or riding to work, *Pittard v. Red River Oilfield Servs., LLC*, No. 4:15-CV-3753, 2017 WL 6498336, at *2-3 (S.D. Tex. Dec. 15, 2017).

Because "commuting to work is necessary for any job," § 254(a) ties "FLSA coverage" to principal activities that employers employed their employees to perform. *Bennett v. McDermott Int'l, Inc.*, 855 F. App'x 932, 936 (5th Cir. 2021) (per curiam). Thus, by regulation, "[n]ormal travel from home to work is not worktime." 29 C.F.R. § 785.35. But "[a]ny work which an employee is required to perform while traveling must, of course, be counted as hours worked." *Id*. § 785.41. Furthermore, "[a]n employee who drives a truck, bus, automobile, boat or airplane, or an employee who is required to ride therein as an assistant or helper, is working while riding, except during bona fide meal periods or when he is permitted to sleep in adequate facilities furnished by the employer." *Id*. Moreover, "[t]ime spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked." *Id*. § 785.38. This means that when

> an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice.

*Id*.

In addition, "even if an activity might otherwise be compensable," courts may disregard

de minimis activities that merely concern "a few seconds or minutes of work beyond the scheduled working hours." *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448, 454 (5th Cir. 2009) (per curiam) (citation and internal quotation marks omitted). For instance, because "obtaining standard tool bags" that are "located in easily accessible cabinets near [the employees'] lockers"; engaging in a process that normally takes seconds, such as "clocking in and out"; and "donning and doffing generic safety gear (e.g., hearing and eye protection)" all involve "a de minimis amount of time," they are "non-compensable activities under the FLSA." *Id.*

The de minimis rule has been incorporated into applicable regulations. *See Chambers*, 428 F. App'x at 414-15.

> In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47 (citations omitted). The regulation cites with approval a "holding that 10 minutes a day is not de minimis." *Id.* And "[m]ost courts have found daily periods of approximately 10 minutes *de minimus* [sic] even though otherwise compensable." *Von Friewalde*, 339 F. App'x at 454 (quoting *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984)). Not only is "the aggregate amount of compensable time" relevant to "determining whether otherwise compensable time is *de minimis*, but" courts also consider "the practical administrative difficulty of recording the additional time" and "the regularity of the additional work." *Stuntz v. Lion Elastomers, LLC*, 826 F. App'x 391, 399 (5th Cir. 2020) (quoting *Rutti v. Lojack Corp.*, 596 F.3d 1046, 1057 (9th Cir. 2010)).

### III. BURDEN OF PROOF

Decades ago, the Supreme Court set out "a burden-shifting framework for federal wage claims." *U.S. Dep't of Labor v. Five Star Automatic Fire Prot., LLC*, 987 F.3d 436, 439 (5th Cir. 2021) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, (1946), *superseded by statute on other grounds*, 29 U.S.C. § 254(a)), *cert. denied sub nom. Five Star Automatic Fire Prot., LLC v. Dep't of Labor*, 142 S. Ct. 1667 (2022).[5] *Anderson* recognized that employees who bring suit "for unpaid minimum wages or unpaid overtime compensation" have "the burden of proving that [they] performed work for which [they were] not properly compensated." 328 U.S. at 686-87; *accord Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016).

When "the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes" an employee can carry that burden by proving "that he has in fact performed work for which he was improperly compensated and [by producing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." 328 U.S. at 687; *accord Bouaphakeo*, 577 U.S. at 456. The Fifth Circuit and other circuits have recognized that this "standard allows plaintiffs to establish a prima facie case for non-testifying employees based on the 'fairly representational' testimony of other employees." *Albanil v. Coast 2 Coast, Inc.*, 444 F. App'x 788, 806 (5th Cir. 2011) (citing several cases, including *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 829 (5th Cir. 1973)). Once the employee meets that initial burden,

> [t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

---

[5] Although the Portal-to-Portal Act modified *Anderson*'s definition of compensable work, *Anderson*'s discussion of burden of proof "remains good law" because "Congress did not speak to th[at] issue." *Adams v. United States*, 471 F.3d 1321, 1326 (Fed. Cir. 2006).

328 U.S. at 687-88.

Courts have set out "a three-part test for determining whether an employee is entitled to overtime compensation for an activity performed before or after a shift." *Akpeneye v. United States*, 146 Fed. Cl. 356, 365 (2019) (citing cases). Employees bear the burden to show each element – they must show that they "engaged in an activity that (1) constitutes work, (2) is a principal activity (which is satisfied if the activity is integral and indispensable to a principal activity), and (3) requires more than a de minimis amount of time."[6] *Id*. They have the burden to prove that identified activities "were not merely preliminary and postliminary activities, but rather 'principal activities,' which embraces those tasks that are 'integral and indispensable' to their [employment] duties." *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1370 (S.D. Ga. 2015). Stated differently, the employee's initial burden "necessarily includes the burden to demonstrate that what was performed falls into the category of compensable work." *Adams v. United States*, 471 F.3d 1321, 1326 (Fed. Cir. 2006).

When drive time is at issue, employees have "the burden of showing that their drive time was compensable work for FLSA purposes and of showing that it does not fall into the set of activities excluded from the definition of compensable work by the Portal–to–Portal Act." *Id*. And when use of a company vehicle is involved, the employee has the burden to show the travel is outside the normal commuting area or that the use is not subject to an agreement between the employer and employee. *See Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 413 (5th Cir. 2011) (per curiam) (noting that the plaintiff-employees had "produced no evidence that their commutes were . . . not 'normal' for their 'employer's business or establishment'"). Stated suc-

---

[6] Plaintiffs argue that "[t]he *de minimis* doctrine is an affirmative defense upon which the Defendant has the burden of proof." ECF No. 150 at 33. But they cite to no binding authority and placing the burden on the plaintiffs is consistent with their burden to show that they are entitled to overtime compensation. Notably, in an unpublished opinion, the Fifth Circuit has likewise placed the burden on plaintiffs. *See Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448, 458 (5th Cir. 2009) (per curiam). Moreover, when the Supreme Court recognized "the application of a de minimis rule" in *Anderson*, it did not indicate that such rule was an affirmative defense or otherwise modified the burden-shifting framework set out in the same opinion. *See* 328 U.S. at 687, 692-93.

cinctly, plaintiffs bear the burden to show that they "must be compensated, and that neither the PPA nor the ECFA apply." *Scalia v. AWP, Inc.*, No. 1:18-CV-1183, 2020 WL 7639980, at *3 (W.D. Mich. Dec. 23, 2020).

Employers that claim an exemption to the FLSA bear "the burden of proving [their] exempt status." *Cleveland v. City of Elmendorf*, 388 F.3d 522, 526 (5th Cir. 2004); *accord Smith v. Ochsner Health Sys.*, 956 F.3d 681, 684 (5th Cir. 2020) ("The employer has the burden of proof on a claimed exemption.").[7] These exemptions relate to FLSA coverage in general, *see Cleveland*, 388 F.2d at 525-27, rather than exclusions from compensable work under the PPA or ECFA.

These FLSA burdens must be considered in the context of the current motions for summary judgment. Thus, while Plaintiffs have the ultimate burden in some respects, Defendant, as the party moving for summary judgment must carry its initial burden under Fed. R. Civ. P. 56(a). An employer moving for summary judgment must show that the plaintiffs cannot meet their "burden of proof regarding" the FLSA exceptions at issue or that an exception applies even under the plaintiffs' "version of facts." *Scalia*, 2020 WL 7639980, at *1.

With respect to Plaintiffs in Subclasses 1 and 3, Defendant contends that it is entitled to summary judgment for three reasons: (A) alleged pre- and post-trip activities are not an intrinsic element of Plaintiffs' work activities; (B) alleged pre- and post-trip inspections were de minimis; and (C) implausible testimony regarding inspections. ECF No. 138 at 13; ECF No. 140 at 2. With respect to Subclasses 2 and 4, Defendant reiterates that the alleged pre- and post-trip activi-

---

[7] Although prior caselaw of the Fifth Circuit erroneously enunciated a narrow construction or interpretation of exemptions, the Supreme Court has "clarified that courts are to give FLSA exemptions 'a fair reading.'" *See Carley v. Crest Pumping Techs., LLC*, 890 F.3d 575, 579 (5th Cir. 2018) (quoting *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)); *Amaya v. NOYPI Movers, LLC*, 741 F. App'x 203, 204-05 & n.2 (5th Cir. 2018) (per curiam) (citing *Carley* and recognizing that prior caselaw enunciating the narrow construction remains good law in other respects). Thus, while *Cleveland* previously applied a narrow interpretation of exemptions, the case remains good law to the extent it was not abrogated by *Encino Motorcars*.

ties are not an intrinsic element and are de minimis in any event. ECF No. 139 at 2, 8; ECF No. 141 at 2, 7. For Plaintiffs lacking any pre-trip activities, Defendant argues that the morning commute is not compensable as a matter of law. ECF No. 139 at 8-9. Similarly, for Plaintiffs lacking any post-trip activities, Defendant argues that the evening commute in not compensable. ECF No. 141 at 2. Plaintiffs naturally disagree with Defendant. *See*, *generally*, ECF No. 150 at 14-46, ECF No. 151 at 8-21, ECF No. 152 at 8-30, ECF No. 153 at 7-19.

## IV. REPRESENTATIVE EVIDENCE

As noted in the previous section, plaintiffs in a given case may rely on testimony from other employees when such testimony is "fairly representational" of the non-testifying employees. *See Albani v. Coast 2 Coast, Inc.*, 444 F. App'x 788, 806 (5th Cir. 2011) (citing cases). Plaintiffs here urge the Court to permit them to rely on representative evidence to survive summary judgment. *See*, *e.g.*, ECF No. 150 at 57. Defendant opposes reliance on representative evidence. *See* ECF No. 156 at 32-35 (relying on *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448 (5th Cir. 2009) (per curiam)).

In rejecting "a broad rule against the use in class actions of what the parties call representative evidence," the Supreme Court has stated that such a "categorical exclusion . . . would make little sense." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454 (2016). Rather than categorically exclude such evidence, the Supreme Court recognized that a

> representative or statistical sample, like all evidence, is a means to establish or defend against liability. Its permissibility turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action. *See* Fed. Rules Evid. 401, 403, and 702.

*Id*. at 454-55.

As *Albani* recognizes, plaintiffs may satisfy their initial burden of proof through the testimony of some plaintiffs of a collective action when such testimony is "fairly representational"

of the non-testifying plaintiffs. 444 F. App'x at 806. And, furthermore, like *Albanil*, "in contrast to *Von Friewalde*," this case "satisfies the requirement that the testifying employees are 'fairly representational.'" *Id*. at 807. Plaintiffs are all frack fuel technicians. This Court thoroughly considered their similarities and alleged dissimilarities in concluding that they are similarly situated and may proceed as a collective action. In general, the Court is confident that testimony from some plaintiffs is sufficiently reliable to permit the testimony to be used on a representative basis. And to the extent Defendant relies on contradictory evidence, including an absence of evidence from particular Plaintiffs, such inconsistencies generally present factual disputes that "can be fleshed out if necessary at trial." *Stanley v. Car-Ber Test. Texas, LLC*, No. 1:13-CV-374, 2015 WL 3980272, at *7 (E.D. Tex. June 29, 2015).

## V. SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of inform-

ing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When seeking summary judgment on an affirmative defense, the movant "must establish beyond peradventure" each essential element of the defense. *Access Mediquip LLC v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), *adhered to on reh'g en banc*, 698 F.3d 229 (5th Cir. 2012); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

When considering a motion for summary judgment, courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. With this shifting burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Additionally, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

## VI. QUESTIONS OF LAW AND FACT

Courts determine as a matter of law whether, on a given set of facts, an employee is engaging in work. *Bright v. Houston Nw. Med. Ctr. Survivor, Inc.*, 934 F.2d 671 (5th Cir. 1991) (en banc). In addition, "[w]hether an employee is within an exemption is a question of law, but how an employee spends his working time is a question of fact." *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 684 (5th Cir. 2020) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)). And courts also treat "[i]nferences about the nature of an employee's work . . . as questions of fact." *Id.* (citing *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1226 (5th Cir. 1990)). Similarly,

"[w]hether a particular activity is 'integral and indispensable' under the FLSA is a question of law," but "[t]he nature of the employees' duties . . . is a question of fact." *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1371 (S.D. Ga. 2015) (citations omitted); *accord Birdwell v. City of Gadsden*, 970 F.2d 802, 807-08 (11th Cir. 1992).

## VII. APPLICATION OF LAW TO FACTS

This case requires determining when Plaintiffs' workday commenced, when it ended, and what time is compensable under the FLSA. Such determination delves into several legal principles, including compensability in general, identification of Plaintiffs' principal activities, commencement and conclusion of their workday, whether drive time qualifies as a non-discretionary bonus, and compensability of standby time. While the general and procedural background section provides an apt overview of the full picture of this case, additional facts are pertinent to resolve the motions for summary judgment.[8] Some general additional facts are included in the next subsection, whereas others are added as needed in later subsections.

### A. Additional Facts

Through its Human Resources Department, Defendant developed a compensation and hiring plan for frack fuel technicians such as Plaintiffs in this action. Dep. Mason 39:1-40:16 (ECF No. 125-1). As for employees like Plaintiffs, Defendant enticed them to work for it through a series of incentives. *Id*. 39:14-21. First, it would increase their current rate of pay by "add[ing] 50 cents or a dollar to it." *Id*. 39:17. Next, it would "offer[] them the drive time and the stand-by time . . . and per diem that the company that they were working for had recently cut out in order to get them to – come work for [Defendant]." *Id*. 39:18-21. Defendant considered drive and stand-by pay as a "perk" for its employees. *Id*. 42:7-17.

Defendant hired the Plaintiffs in this case in accordance with a hiring and compensation

---

[8] The facts are either uncontested or viewed in the light most favorable to the nonmovants in accordance with the summary judgment standard.

plan developed by its human resources department. *See id*. 39:1-40:16. Each employee would report their own hours worked. *Id*. 41:10-12. They would track their hours on paper timecards. *Id*. 19:8-12. Each employee "had a paper timecard for driving and then a paper timecard for other work." *Id*. 19:14-18. Stated differently, Defendant "had a working timecard if [the employees] were on the yard or on location performing work, and then also one if [the employees] were driving from a hotel or man camp to location." *Id*. 19:18-21. Defendant's policy "is to review everyone's time to make sure it's correct." *Id*. 24:16-20. This policy applied to all Plaintiffs. *See id*. 26:7-9. Consistent with this policy, Defendant audited all timecards. *Id*. 24:20-25:2.

Plaintiffs have provided a collection of paystubs and timecards to support their claims. *See* ECF No. 150-2 (App. B). In addition, they have compiled tables identifying the number of hours Defendant paid Plaintiffs for four categories of pay referred to as "Regular," "Overtime," "Standby" and "Drive Time" each week as stated in pay stubs produced by Defendant. *See* ECF No. 150-3 (App. C). As shown by those tables, Drive Time ceased to be a category of pay in July 2017, *see*, *generally*, *id*., and Defendant does not contest that fact.

Employee earning statements show the employee's regular rate of pay, which is received for all hours designated as "drive time" or "stand-by time." *See* Dep. Mason 26:11-29:11; 31:9-18. Employees would receive drive time pay when "commut[ing] to and from the hotel to location." *Id*. 28:1-4. Defendant gave both riders and drivers this pay. But, because employees "take turns being the driver of the van," and because "there are four people" per van, any particular employee "would only be driving 25 percent of the time," assuming that they share driving equally. *Id*. 28:13-16. Furthermore, all employees "get the overtime rate when they're headed to a job with the commercial vehicles." *Id*. 30:11-12. In addition, "when they've come to the yard and picked up all their equipment and then they head to [a well site] . . . those are working hours" and not "considered drive time hours." *Id*. 30:12-16.

Plaintiffs performed a variety of work for Defendant at the yard, including vehicle maintenance, oil changes, changing tires, and washing vehicles. *See* ECF No. 150 at 21 & n.24 (identifying evidence); ECF No. 152 at 15 & n.11 (same). These activities were part of Plaintiffs' regular work at the yard. *See* ECF No. 150 at 21. Work at the yard also included cleaning and maintaining equipment, pre-loading vehicles and trailers, and cleaning and maintaining the shop and grounds on the yard. *See id.* at 16 & nn.11-12 (identifying evidence). While at the yard, Plaintiffs would prepare to go to the well site by loading equipment prior to driving or riding to the site with co-workers. *See id.* at 16-17 & n. 13 (identifying evidence). They would also perform the same pre-trip inspection that they would perform at the hotel. *See id.* at 17 & n.14 (identifying evidence). Although Defendant contests many of these activities for various reasons, the Court views the facts in the light most favorable to the nonmovant.

Plaintiffs regularly performed pre- and post-trip inspections because Defendant required them to do so. *See id.* at 17-18 & nn.15-16 (identifying evidence); ECF No. 152 at 13 (same). Defendant and its customers required Plaintiffs to use the company van to travel to and from the well sites. ECF No. 150 at 6 & n.2 (identifying evidence); 19; ECF No. 152 at 13 & n.6 (same). Travel between the hotel and the well sites often exceeded an hour and rarely took less than thirty minutes. ECF No. 150 at 19 & n.19 (identifying evidence). Many well sites had extremely rough and muddy conditions making travel unsuitable for many vehicles and putting additional strain on the company van. *Id.* at 20 & n.20 (identifying evidence). Accordingly, regardless of whether the pre- or post-trip inspection occurred at Defendant's yard, at the customers' well site, or at the hotel, the purposes of the inspection include ensuring proper maintenance of the vehicles and safety of the passengers. *Id.* at 20 & n.22 (identifying evidence); ECF No. 152 at 14-15 (same).

**B. Discretionary Bonus**

As previously found by the Magistrate Judge, a genuine dispute of material fact exists as to whether drive time payments are excludable from regular pay as discretionary through 29 U.S.C. § 207(e)(3) or whether drive time should be included in the calculation of regular pay. *See* R&R at 12-14. And as demonstrated by the hiring and compensation plan set out in the preceding section, the current summary judgment evidence does not eliminate that genuine dispute. Thus, Plaintiffs' regular rate of pay claim will proceed to trial in some form. To the extent that drive time is not compensable under the FLSA, the claim proceeds as a standalone claim. Otherwise, it proceeds as an alternative basis to compensability.

Defendant provides a declaration of Robert Curry, its Vice President of Texas Operations, that drive time payments have always been discretionary. App. 450-51 ¶¶ 3, 6.It also provides an offer letter to Plaintiff Dominique Dixon that does not state that employees are entitled to compensation for drive time. *See* App. 454 . But on summary judgment, the Court views the evidence in the light most favorable to the nonmovant. And through that lens, neither the declaration nor the submitted offer letter overcomes the deposition testimony of Brittany Mason. Furthermore, the evidence shows that Defendant did pay for drive time at the employee's regular rate of pay until 2020. App. 450-51 ¶¶ 5-6.

Based on the submitted evidence, a reasonable jury could return a verdict for Plaintiffs on this claim.

**C. Compensability**

Plaintiffs seek overtime compensation for travel and other activities taken before or after their normal work shifts. They would travel from the hotel at which they were lodged to one of two places – either Defendant's yard or to a specific customer well site. They would also travel from the yard to well sites. Similarly, they traveled from well sites to the yard before traveling to

the hotel and traveled directly from well sites to the hotel.

### 1. <u>Controlling Authority</u>

With respect to whether Plaintiffs' commute time is compensable, Defendant argues that *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400 (5th Cir. 2011) (per curiam) is "controlling authority". ECF No. 138 at 1. But "unpublished cases are not precedent and therefore cannot conclusively preclude anything." *Bennett v. McDermott Int'l, Inc.*, 855 F. App'x 932, 937 (5th Cir. 2021) (per curiam) (citing 5th Cir. R. & IOP 47.5.4). As an unpublished opinion, *Chambers* does not have the binding effect to which Defendant ascribes to it. *See* U.S. Ct. of App. 5th Cir. R. 47.5 (recognizing that only unpublished opinions issued before January 1, 1996, are considered precedent); *Gibson v. Kilpatrick*, 838 F.3d 476, 488 n.23 (5th Cir. 2016) (recognizing that a prior opinion was "binding precedent under 5TH CIR. R. 47.5 because it was published"); *Williams v. Dallas Area Rapid Transit*, 242 F.3d 315, 319 (5th Cir. 2001) (recognizing that unpublished opinions are not binding); *Williams v. Dallas Area Rapid Transit*, 256 F.3d 260 (5th Cir. 2001) (per curiam) (Smith, J. dissenting from denial of rehearing en banc) ("The refusal of the en banc court to rehear this case en banc is unfortunate, for this is an opportunity to revisit the questionable practice of denying precedential status to unpublished opinions."). "An unpublished opinion issued after January 1, 1996 is not controlling precedent, but may be persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 & n.7 (5th Cir. 2006) (citing 5th Cir. R. 47.5.4.). This Court has cited *Chambers* for various legal principles either because the case itself relies on binding authority or because the case is persuasive as to the cited principles. But standing alone, *Chambers* is not controlling authority. Defendant overstates the importance of *Chambers*. Moving past that overstatement, the Court sets out applicable legal principles regarding compensability.

## 2. <u>General Legal Principles</u>

Whether time is compensable is a factual inquiry dependent on the particular circumstances of the case. *See Vega v. Gaspar*, 36 F.3d 417, 425 (5th Cir. 1994) (considering several factual factors in making compensability determination), *abrogation recognized on other grounds*, *Bridges v. Empire Scaffold, LLC*, 875 F.3d 222, 228 (5th Cir. 2017) (recognizing that predominant benefit test addressed in *Vega* predated *Busk* thus making *Vega* "inapposite" and "effectively abrogated"), *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448, 454 (5th Cir. 2009) (per curiam) (discussing several factual factors).

In general, 29 U.S.C. § 254(a) is the starting point for determining compensability for certain activities. Section 254(a) makes two broad categories of activities not compensable absent contract or custom: (1) travel "to and from the actual place of performance of" the employee's principal activities and (2) preliminary and postliminary activities, i.e., activities that are performed either prior to or after principal activities. Section 254(a) also specifically excludes both the travel time from use of company vehicle and activities incidental to such use from an employee's principal activities when two criteria are met – use of the vehicle is within the normal commuting area for the defendant's business and the use is subject to agreement between the employee and employer. No one disputes satisfaction of these two criteria in this case.

Compensability determinations, however, do not end with § 254(a), because § 254(b) makes activities that would otherwise be excluded by § 254(a) compensable through either an express contractual provision or a custom or practice that is not inconsistent with a contract. But the § 254(b) exception to subparagraph (a) does not affect the compensability of "ordinary travel from home to work," which "need not be counted as hours worked even if the employer agrees to pay for it." 29 C.F.R. § 785.34. Consequently, the Court must determine whether Plaintiffs' travel constitutes ordinary travel from home to work.

### 3. <u>Normal or Ordinary Travel</u>

Ordinary or normal travel is from an employee's home to work. *See* 29 C.F.R. § 785.35. This travel is not worktime. *See id.* "The phrase, 'normal travel,' is not an objective standard of how far most workers commute or are reasonably expected to commute but rather 'a subjective standard, defined by what is usual within the confines of a particular employment relationship.'" *Johnson v. RGIS Inventory Specialists*, 554 F. Supp. 2d 693, 703 (E.D. Tex. 2007) (quoting *Kavanagh v. Grand Union Co.*, 192 F.3d 269, 272 (2d Cir. 1999)). The fact that an employee's commute is from a hotel to work does not change its essential character as normal travel, because caselaw has construed "travel to and from lodgings, such as a hotel" or man camp as equal to travel from home. *See Moore v. Performance Pressure Pumping Servs., LLC*, No. 5:15-CV-346-RCL, 2017 WL 1501436, at *10 (W.D. Tex. Apr. 26, 2017). But travel is neither normal nor ordinary when it is intertwined with an employee's principal activities, 29 C.F.R. § 785.38, or when the employee is actually working while traveling, *id.* § 785.41. In those instances, travel time is compensable. No employee in this case identifies any required work while traveling, except for driving the van, which the Court will address in more detail later.

These principles apply whether an employee voluntarily utilizes a means of transportation, *see Vega*, 36 F.3d at 424, or is compelled to use employer-mandated transportation, *Bennett*, 855 F. App'x at 938. That employees must travel with co-workers in employer-provided transportation does not make the travel either extraordinary or abnormal. *See Griffin v. S & B Eng'rs & Constructors, Ltd.*, 507 F. App'x 377, 382 (5th Cir. 2013) (per curiam). When an employer buses employees to and from the place of employment through a mandatory transportation scheme, the travel time is not compensable merely because employees must travel by the provided bus. *See id.* at 382-83.

Whether an employee's travel is normal or ordinary depends on whether he is engaging

in principal activities or actually working while traveling. Thus, before making any determination as to compensability of travel time, the Court considers what constitutes the principal activities of employees, like Plaintiffs, who Defendant employs as frack fuel technicians, often referred to as operators.

## D. Principal Activities and Plaintiffs' Workday

Determining the principal activities of an employee is a fact-intensive, multi-step process. Notably, 29 U.S.C. § 254(a) has no bearing on an employer's FLSA liabilities and obligations for an employee's time spent engaging in principal activities. *See* 29 C.F.R. § 790.8(a). Section 254(a) "distinguishes between activities that are essentially part of the ingress and egress process, on the one hand, and activities that constitute the actual 'work of consequence performed for an employer,' on the other hand." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 38 (2014) (Sotomayor, J., concurring).

Although the statute does not define principal activities, *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 409 (5th Cir. 2011) (per curiam), § 254(a) remains relevant given that both broad categories of non-compensable activities set out therein depend on the principal activities of the employee. Not only is it "generally necessary to determine what are such 'principal' activities," before determining "whether an activity is 'preliminary or postliminary to (the) principal activity or activities,'" but travel compensability is defined in terms of to and from the location where the employee performs the principal activities. *See* 29 C.F.R. § 790.8(a).

Thus, the critical first step requires determining the general principal activities for which the employee was employed. For ease of reference, the Court will identify these general activities as "hired activities." These activities must constitute "productive work that the employee is *employed* to perform." *Busk*, 574 U.S. at 36. A related step that may be required is determining where the activities were to be performed, depending on whether work location is in dispute.

Employees may have multiple principal activities and an activity need not predominate over other activities to be considered a principal activity. *See* 29 C.F.R. § 790.8(a). "Congress intended the words 'principal activities' to be construed liberally in the light of the foregoing principles to include any work of consequence performed for an employer, no matter when the work is performed." *Id*.

Furthermore, although, as a general rule, "preliminary and postliminary activities are not compensable," such activities are compensable when they "are an integral and indispensable part of the principal activities for which workmen are employed and not specifically excluded by [§ 254(a)(1)]". *Chambers*, 428 F. App'x at 413 (second quote attributed to *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956)). This is so, because integral and indispensable activities "are themselves principal activities." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 33 (2005) (citation and internal quotation marks omitted); *accord Busk*, 574 U.S. at 36. Thus, a second step requires determining whether an activity that differs from the hired activities is nonetheless a principal activity by virtue of it being integral and indispensable to the hired activities. While an employee may not be specifically hired to do a particular activity, its integral and indispensable nature makes it a principal activity itself.

It is important to recognize that, "it is not only an employee's single predominant principal activity (and activities indispensable to it) which are compensable under the F.L.S.A., but rather all principal activities and any tasks incidental to them." *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 400 (5th Cir. 1976). Courts err when they unnecessarily limit the definition of principal activities. *See id*.

> The test, therefore, to determine which activities are 'principal' and which are 'an integral and indispensable part' of such activities, is not whether the activities in question are uniquely related to the predominant activity of the business, but whether they are performed as part of the regular work of the employees in the ordinary course of business.

*Id*. at 400-01. Under this test, it is "irrelevant" whether an activity is "directly related" to the employer's business, but it is important "that such work is necessary to the business and is performed by the employees, primarily for the benefit of the employer, in the ordinary course of that business." *Id*. at 401.

Although *Busk* "revisited the meaning of 'integral and indispensable' and offered a more precise, albeit more restrictive, view" by rejecting tests that "focus on whether an employer *required* a particular activity or whether the activity is for the *benefit* of the employer," *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1370 (S.D. Ga. 2015), *Busk* does not eliminate all reliance on those factors, it simply holds that those factors alone are not determinative because to hold otherwise would threaten to "sweep into 'principal activities' the very activities that the Portal-to-Portal Act was designed to address," *see* 574 U.S. at 36. Under the test set out in *Busk*, "an activity is integral and indispensable to the principal activities that an employee is employed to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Id*. at 37. This "test is tied to the productive work" the employer pays its employees to perform. *Id*. at 36.

### 1. Well Site Activities

While at a well site, employed fuel techs, like Plaintiffs, ride in a bobtail and stop to refuel equipment. App. 451 (Robert Curry Decl.) ¶ 7. Plaintiffs concede that they were hired to perform work at the customer job sites. ECF No. 150 at 16. And no one disputes that these are principal activities of Plaintiffs. Once employees reach the well site and commence these job activities, their time is compensable under the FLSA until their workday ends. Defendant essentially seeks to limit Plaintiffs' principal activities to these activities performed at the well site.

## 2. **Yard Activities**

But Plaintiffs also regularly perform various activities off site, including working in Defendant's "yard" where they performed substantial work activities, including preparing for travel to the well site and loading tools and supplies. *See*, *e.g.*, ECF No. 150 at 16 n.11 (identifying declaration evidence). Some work in the yard would constitute an independent workday that included cleaning and maintaining Defendant's vehicles and equipment, pre-loading vehicles and trailers, and cleaning and maintaining the shop and grounds on the yard. *See id*. at 16 n.12 (identifying declaration evidence).

Viewing the summary judgment evidence in the light most favorable to Plaintiffs, the Court finds that Defendant hired Plaintiffs to perform work at multiple job sites, including working in its yard when necessary or when work was unavailable at a well site. Consequently, Plaintiffs' principal activities go beyond the work performed at a well site. Principal activities are not limited to those identified by the employer when facts show that the employees performed other activities. Thus, once employees reach the yard and commence their job activities, their time is compensable under the FLSA until their workday ends. This is consistent with deposition testimony from Mason that Defendant considers drive time from its yard to a well site as working hours. *See* Dep. Mason 30:11-16. Furthermore, Defendant concedes that drive time from its yard to the well site "would be compensable because the Plaintiffs are not driving from home or their lodging." *See* ECF No. 156 at 37.

Additionally, for days employees performed substantive independent work at Defendant's yard, the Court need not consider whether the yard activities are integral and indispensable to Plaintiffs' activities at a well site. The two locations are distinct, and Plaintiffs present evidence that, although they were hired to perform work at well sites, they were also hired to perform different work at the yard when necessary or when work was unavailable at a well site. In

addition, for days when employees were required to travel to Defendant's yard to receive instructions, perform other work there, or to pick up and carry tools, such activities commence the employee's workday and any travel from there to a different jobsite is compensable worktime. *See* 29 U.S.C. § 785.38.

### 3. Driving Company Van

Plaintiffs also contend that driving the company van constitutes a principal activity that occurs before arriving at either the yard or other jobsite. In some respects, such driving appears minimally different from a normal commute to work with co-workers. But 29 C.F.R. § 785.41 does state that drivetime is worktime for some employees. The Department of Labor ("DOL") has stated that § 785.41 applies "when an employee is the operator of a vehicle, or is an assistant or helper to such operator." *See Julian v. Swift Transp. Co. Inc.*, No. CV-16-00576-PHX-ROS, 2019 WL 10948736, at *3 (D. Ariz. Dec. 10, 2019) (quoting a 1979 letter from the DOL). And the broad language of the regulation bears that out. *See* 29 C.F.R. § 785.41 ("An employee who drives a truck, bus, automobile, boat or airplane, or an employee who is required to ride therein as an assistant or helper, is working while riding, except during bona fide meal periods or when he is permitted to sleep in adequate facilities furnished by the employer.").

No employee in this case contends that they worked as such an assistant or helper, but Plaintiffs do contend that they were engaged in compensable work when they were driving the van. Neither side presents binding caselaw on the issue. But the parties do present competing, non-binding caselaw that this Court might find persuasive. A case not cited by either party appropriately recognizes that "[i]t is, of course, difficult to fix a definite standard for determining what activities of an employee, performed before and after his hours of work, are an integral part of and indispensable to his principal activities"; thus, "[e]ach case must be decided upon its peculiar facts." *See D A & S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552, 554-55 (10th Cir.

1958) (cited with approval in *Bennett v. McDermott Int'l, Inc.*, 855 F. App'x 932, 938 (5th Cir. 2021) (per curiam)). And in this regard, "because facts differ decided cases are not controlling and are helpful only as they point the way." *Id*. at 555 n.4 (citation and internal quotation marks omitted). The Court finds these principles from *Mitchell* instructive, persuasive, and equally applicable when determining whether identified activities are themselves principal activities.

Plaintiffs rely on *Knowles v. United States*, 29 Fed. Cl. 393 (1993) to support their position that driving co-workers "is compensable work." *See* ECF No. 150 at 22. *Knowles* specifically addresses whether employees are engaging in work when "driving their coworkers and themselves to and from their place of employment." *See* 29 Fed. Cl. at 393. In analyzing the issue, the court states:

> It is difficult to challenge the logic of plaintiffs' argument that chauffeuring is work. It plainly differs from merely riding as a passenger or even driving oneself. The responsibility for driving comes with numerous attendant obligations, not the least of which is staying awake and steering the van from place to place. The burden of that obligation is commensurately greater when one is responsible for the safety of others. The driver also has to fuel the vehicle and has to make certain it is in good repair. If the driver were sick or chose to take a day off, presumably he would be obligated to ensure that another suitable driver replaced him. No doubt Greyhound bus drivers view their activity as a form of work for these and other reasons. Plaintiffs were tasked to do work previously assigned to other Corps employees, and for which the Corps had previously paid. Leaving the driving to them has obvious advantages, which come at a price.

*Id*. at 394. The court declined to accept the defendant's position "that plaintiffs were merely driving themselves to work," as "at odds with the facts." *Id*. In doing so, the court found the "duty to drive others" particularly relevant while also noting the employees lacked the ability to use "the vans for their exclusive use." *Id*. at 395.

*Knowles* is distinguishable in that the "action [was] brought under certain provisions of the Federal Employees Pay Act ("FEPA") granting entitlement to overtime pay," rather than the FLSA. *See id*. at 393. The plaintiffs "were exempt from the overtime coverage" provided by the FLSA. *See id*. The court thus addressed provisions of the FEPA. *See id*. at 393-95. This makes

the court's reliance on "the difference between traveling and driving," *see id.* at 395, less persua-

sive. As recognized in *Knowles*, the term "travel" is undoubtedly broader than the term "drive."

*Id*. And in construing the statute before it, the court had reason to focus on the differences be-

tween the terms. But in making certain travel time not compensable under the FLSA through 29

U.S.C. § 254(a), Congress intended to encompass a broad range of activities beyond mere driv-

ing. Section 254(a) also makes walking and riding non-compensable. Consequently, the distinc-

tion between traveling and driving in *Knowles* does not support making a similar distinction for §

254(a). The key to § 254(a) is not the mode of transportation or whether one is riding or driving,

but rather whether the trip is to or from the place where the traveler performs principal activities.

The persuasive value of *Knowles* lies with whether the duty to drive co-workers in conjunction

with an inability to use the vehicle for the driver's own use is sufficient to deem driving to be

work or a principal activity, which would remove the activity from the coverage of the non-

compensability provision of § 254(a), including the additional language added by the ECFA in

1996.

Plaintiffs also rely on *Scalia v. AWP, Inc.*, No. 1:18-CV-1183, 2020 WL 7639980 (W.D.

Mich. Dec. 23, 2020) to support their position. *See* ECF No. 150 at 56. In that case, "Plaintiff,

the Department of Labor (DOL), claim[ed] that driving time after flagger-drivers pick up their

partners must be compensated, as must be time spent dropping off partners after leaving the

worksite." 2020 WL 7639980, at *1. The court denied summary judgment to the DOL because

the DOL had not "demonstrate[d] that the PPA and ECFA are indisputably inapplicable" under

the facts. *Id*. It also denied summary judgment to the defendant because the defendant had nei-

ther shown "that the DOL cannot meet its burden of proof regarding one of the three exceptions

to the FLSA at issue" nor shown "that, even under the DOL's version of the facts, one of the ex-

emptions applies in this case." *Id*.

The *Scalia* court found two dispositive questions, both of which had "genuine disputes of material fact" that needed to be resolved before determining an answer: (1) whether it was part of the employee's job to pick-up and transport passengers, and if not, (2) whether "transporting a partner [was] integral and indispensable" to the employee's principal activity. *Id*. at *1-2. Whether employees could drive their own vehicles to the worksite was a disputed fact relevant to question one. *See id*. at *3. Another disputed fact was whether the nature of the job required two persons. *See id*. The court thus denied cross-motions for summary judgment, except for an abandoned liquidated damages claim. *Id*. at *2.

*Scalia* also has a distinguishing feature. Unlike the employees in *Scalia*, Plaintiffs here had no need to travel to pick up or drop off any co-worker. Defendant housed all crew members at the same hotel. Each crew member would meet at the company van to travel to and from the work site. One crew member would drive the others from there. Thus, *Scalia*'s persuasiveness might be affected by this distinguishing feature.

In reply, Defendant asserts that "[i]t is undisputed that the passenger vehicles in this case were used to commute to the jobsites and were not used as part of the plaintiffs' work activities." ECF No. 156 at 22. It summarily rejects Plaintiffs' claim that the driving responsibility makes the drive time compensable because under the PPA, employers are not required to compensate employees for time spent traveling to and from the place of their principal activities. *Id*. at 28. But this rejection ignores the contention that the act of driving co-workers is a principal activity for which Plaintiffs were hired to do.

Defendant relies on *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274 (2006) because it views the circumstances there as "similar to those at hand." *Id*. at 29. *Aztec* involves employees carpooling from a designated meeting point to the crew's assigned work site. The following paragraph from *Aztec* provides much needed context:

> While Aztec does not require its 24–hour crews to drive together to and from the well sites as a matter of official policy, there are a number of reasons why the crews usually do so. First, the roads to the well sites are often impassable without a four-wheel drive vehicle, and not all 24–hour crew members have such a vehicle. Second, most of the well sites are located 50 or more miles outside of the tri-city area, and Aztec will pay the costs of gas for only one vehicle for each shift worked by a 24–hour crew. Third, many well sites are located on gated private property, and crew members driving separately from their drillers would need to pick up the appropriate permits and gate keys from the Aztec office before driving out to the well sites. Fourth, the space available for parking at the well sites can be limited, and there were allegedly times when the tool pushers would prohibit the rig hands from driving to the well sites alone because there was not enough parking space for an additional vehicle. Fifth, the drillers were under pressure from Aztec to arrive on site with a full crew, and the best way for drillers to ensure that everyone on their crew arrived on time was to drive them all to the well site personally.

462 F.3d at 1280. The first sentence of this paragraph reveals an important difference between that case and this one. And the paragraph also reveals that the carpooling occurred in an employee vehicle rather than a company vehicle. In *Aztec*, employees carpooled "because it was more convenient and less expensive than driving alone." *Id*. at 1281. Assuming "that there was sufficient evidence to show that most drillers required their rig hands to travel with them to and from the well sites, and that Aztec knew or should have known about this practice," the Tenth Circuit found no "per se exception for employees just because they must travel with their co-workers." *Id*. at 1288.

The Court need not decide between these various non-binding opinions. While the cases reveal the parties' positions and are helpful as guideposts, their usefulness is limited. Although an argument can be made that a driver is actually working for the employer when driving co-workers to a jobsite, the previously cited *Mitchell* case from the Tenth Circuit distinguished between transporting equipment versus co-workers. *See* 262 F.2d at 555. In *Mitchell*, the court held that "employees who transport equipment without which well servicing could not be done, are performing an activity which is so closely related to the work which they and the other employees perform, that it must be considered an integral and indispensable part of their principal activi-

33

ties." *Id*. While transporting co-workers could garner the same analysis, the court found that "if the trucks are used solely for the transportation of employees to and from their principal place of work, then, we think, the drivers are 'riding, or traveling' within the exclusion of [§ 254(a)]." *Id*. It reasoned that the employer "furnish[ed] such transportation . . . only for the convenience of the employees"; did not designate any employee as a driver, and every "employee, including the driver, is free to take advantage of the convenience or to provide his own transportation." *Id*.

Driving co-workers to and from work differs from hauling necessary equipment. If travel time would be excluded for a lone driver traveling without passengers, it seems unwarranted to make the time compensable *merely* because the driver is accompanied by co-workers. Two or more co-workers can agree to carpool for their own benefit and such arrangement would not make the time compensable. On the other end of the spectrum, however, an employer can certainly pay an employee to drive others to and from work. This latter arrangement would invoke 29 C.F.R. § 785.41 and remove the travel from the specter of normal home-to-work travel for the driver.

So, the pertinent question is whether Defendant has shown that Plaintiffs are unable to show that transporting co-workers is one of the tasks for which Plaintiffs were hired or whether it is integral and indispensable to the principal activities for which Plaintiffs were hired. Here, Defendant clearly hired Plaintiffs to perform work at well sites. Viewing the evidence in the light most favorable to Plaintiffs, it is equally clear that Defendant also hired Plaintiffs to work in its yard at times. If those are the only hired activities, then the facts here make the driving more like a normal commute from home to work, albeit with a co-worker crew. Under such facts, one could not find that one of the tasks Defendant hired Plaintiffs to perform was transporting co-workers to and from work. And, under such facts, the act of driving would not be integral or indispensable to the Plaintiffs' principal activities for which they were hired to perform at either

the yard or a well site. This is essentially how the Defendant views this case. But Plaintiffs see the case differently.

From Plaintiffs' view, driving the van is a principal activity. And viewing the evidence in the light most favorable to Plaintiffs, there is evidence that transporting co-workers is one of the various tasks that Defendant hired Plaintiffs to perform. Until 2020, Defendant paid each frack fuel technician for drive time at their regular rate of pay. Of course, because Defendant paid each such technician for such time whether they drove the company van or merely rode along, this pay is not conclusive evidence that Defendant hired them to drive. But, given the nature of the circumstances, i.e., a crew of four with no certain designated driver, the drive time payments provide some support for the Plaintiffs' claim that transporting co-workers was part of the job for which they were hired. Such pay was also mentioned as an inducement when hiring Plaintiffs.

Further, Defendant did not provide the van transportation merely for the convenience of the employees. Nor did any employee have the option to use his own transportation. And, at no point in the employment history of these Plaintiffs did Defendant designate anyone to drive the company van or specifically pay for such a service when the crews were responsible to get themselves to the jobsite. Although in rare instances, a member of a different crew may pick-up a crew from the hotel for transport to the jobsite, that situation differs from the typical circumstances, and there appears to be no question that such driver would be compensated for his time because his workday had not yet been completed.

Plaintiffs provide declarations that driving the van and transporting co-workers was part of the tasks required for their job. *See* ECF No. 150 at 23 & n.26 (identifying declarations). Of course, in *Busk*, the Supreme Court dispensed with the notion that an employee's principal activities turn on whether the activities are required or whether they even benefit the employer. *See Bridges v. Empire Scaffold, LLC*, 875 F.3d 222, 227 (5th Cir. 2017). But those matters may re-

tain relevancy when determining whether an activity is one for which the employer employed an individual or whether such activity is merely preliminary or postliminary to such a hired activity. While Defendant did not dictate that any particular crew member be the driver, one member of the crew had to drive the van in order to get the crew to the worksite. And Defendant had not hired a van driver to transport other employees. Thus, like the circumstances in *Knowles*, this case has a mandatory duty to drive co-workers along with an inability to use the vehicle for the driver's own use. And the circumstances differ materially from the carpool arrangement at issue in *Aztec*.

Under the facts, a reasonable jury could find that Defendant hired Plaintiffs for a variety of tasks, including driving co-workers to and from jobsites. Viewing the facts in the light most favorable to Plaintiffs, driving the company van to transport co-workers was part of the regular work of the employees in the ordinary course of business. Such work was necessary to Defendant's business, and it was undertaken primarily for the benefit of Defendant in the ordinary course of that business. Transporting Plaintiffs to the well sites was the only way to get necessary workers to the sites. These facts make driving a principal activity for the driver. And for morning and evening drivers, the facts remove the driving from the non-compensability provisions of § 254(a) and the ECFA.[9] Thus, for a morning driver transporting his fellow co-workers from the hotel,[10] his workday would commence no later than the commencement of the drive. Likewise, for the evening driver transporting co-workers from the jobsite to the hotel, the workday would end no later than the ending of the drive. But absent a compensable pre- or post-trip

---

[9] Even though this principal activity is driving an employer's vehicle, such use is not merely for traveling or commuting to or from work. The use is akin to a company bus driver transporting employees to and from work. Just as the bus driver is working while using the company vehicle, so are Plaintiffs when they are driving the company van to transport co-workers to and from a jobsite.

[10] There is evidence that crews were at times housed at a man-camp at the yard rather than a separate hotel. In these instances, the Court views the man-camp the same as the hotel, rather than viewing the location as the Defendant's yard.

activity the workday is not further extended. And for non-driving plaintiff-employees who are transported to and from the hotel, the drive time does not extend their workday or remove their commute from the PPA or ECFA absent a compensable pre- or post-trip activity.

**4. <u>Pre- and Post-trip Inspections</u>**

Having identified the principal activities for which Plaintiffs were hired to perform at the various jobsites, including Defendant's yard, and having concluded that for purposes of summary judgment, driving the company van to transport co-workers to and from the jobsites is also a principal activity, the Court considers whether pre- and post-trip inspections qualify as a principal activity. Many Plaintiffs declare that personnel of Defendant, including Supervisor Elias Gonzales, told them that pre- and post-trip inspections were required as part of their employment. *See* ECF No. 150 at 17-18 & n.15 (identifying declarations related to pre-trip inspections); ECF No. 152 at 13 (identifying declarations related to post-trip inspections). Thus, Plaintiffs regularly performed both types of inspections. *See* ECF No. 150 at 18 n.16; ECF No. 152 at 15.

Like driving the van, inspecting the van was part of the regular work of the employees in the ordinary course of business. But unlike driving the van, pre- and post-trip inspections were not per se necessary to Defendant's business. Such inspections could go unperformed without adverse consequences to its business. Sure, a failure to inspect could delay arrival of workers to a jobsite on any given trip, but overall, most trips would proceed the same regardless of pre-trip inspections. Because pre- and post-trip inspections are not necessary for Defendant's business, the Court finds that no reasonable juror could find that Defendant hired Plaintiffs to perform that task. Therefore, such inspections are either preliminary to the morning drive or postliminary to the evening drive to the hotel.

As a preliminary or postliminary activity, rather than a standalone principal activity, the compensability of such activity "turns on whether [the activity] was integral and indispensable to

the principal activities which [the employees] were employed to perform." *Bridges*, 875 F.3d at 226. In other words, were the pre- and post-trip inspections an intrinsic element of Plaintiffs' principal activities. *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 37 (2014).

Defendant has carried its summary judgment burden to show that Plaintiffs lack enough evidence to show that their pre- and post-trip inspections were compensable preliminary or post-liminary activities. Plaintiffs have not come forward with evidence to create a factual dispute. They have not carried their burden to show that time spent performing pre- or post-trip inspections at the hotel is compensable. On the summary judgment evidence, the Court cannot find that, in general, pre- or post-trip inspections taking place at the hotel qualify as a principal activity. Such inspections are neither integral nor indispensable to the principal activities for which Plaintiffs were employed to perform at either the Defendant's yard or any well site. Such inspections are not an intrinsic element of any principal activity performed at those jobsites.

That Plaintiffs would perform vehicle maintenance and other principal activities at the yard does not make -pre- or post-trip inspections integral or indispensable to those duties. Similarly, that Plaintiffs conducted pre-trip inspections before leaving from the yard to go to a well site does not make similar inspections conducted at the hotel either a principal activity or integral or indispensable to such an activity. To the contrary, the maintenance and other activities performed at the yard, including pre-trip inspections, cut against finding other inspections indispensable or integral.

While not always entirely clear from the briefing, the Court views pre- and post-trip inspections essentially limited to inspections at the hotel – either before departing for the jobsite or concluding a workday. As noted above, the workday for morning drivers commences when the morning drive commences. The workday for the morning riders would start at the latest when they arrived at the destination and started their principal activities. Because any other travel

would be compensable until the workday ended, the only other pre-trip inspection that reasonably might not be compensable is an inspection occurring just prior to the evening drive. But Plaintiffs submit that they conducted post-trip inspections after arriving at the hotel, not pre-trip inspections prior to leaving for the hotel. Nevertheless, to the extent such pre-trip inspections occurred, they would be covered for the evening driver because his workday would not end until either the driving ended at the hotel, or he completed other compensable post-trip activities there. For the evening riders, their workday would end prior to the drive absent a principal activity that extends their workday.

Furthermore, for morning and evening riders, a relevant question is whether the pre-and post-trip inspections "are 'incidental to' the use of a company vehicle for commuting, and hence non-compensable under ECFA." *See Buzek v. Pepsi Bottling Grp., Inc.*, 501 F. Supp. 2d 876, 880 (S.D. Tex. 2007) (recommendation of Mag. J.) (cited with approval in *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 410 (5th Cir. 2011) (per curiam)). And "routine vehicle safety inspections or other minor tasks have long been considered preliminary or postliminary activities and are therefore not compensable." *Id.* at 882 (quoting H.R. Rep. No. 104–585, at 5 (1996)). "To be non-compensable under the Portal-to-Portal Act as amended by the ECFA, the use of the vehicle and incidental activities must" satisfy two criteria that are not in question here – (1) travel "within the normal commuting area" and (2) "subject to an agreement" between the employer and employee. *Chambers*, 428 F. App'x at 410 (quoting 29 U.S.C. § 254(a)).

Additionally, even for morning and evening drivers, pre- and post-trip inspections are neither an integral nor an indispensable part of the principal activity of driving. Such inspections are not an intrinsic element of driving co-workers to a jobsite within the normal commuting area of the employer. In general, a given driver could dispense with the task without adverse consequences. The Court recognizes that the Fifth Circuit has found servicing and refueling as integral

and indispensable to a truckdriver whose "sole, only and principal activity" was driving the truck. *See Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, 725 (5th Cir. 1961). But those tasks for such a fulltime driver differ materially from the pre- and post-trip inspections at issue here.

Likewise, cases cited by Plaintiffs are also distinguishable. Like *Mitchell*, some cases are distinguishable because they concerned full-time drivers who were required to conduct inspections. *See Barrentine v. Ark.-Best Freight Sys., Inc.*, 750 F.2d 47, 50 (8th Cir. 1984); *Scott v. Raudin McCormick, Inc.*, No. 08-4045-EFM, 2009 WL 3561301, at *11 (D. Kan. Oct. 30, 2009); *Hiner v. Penn-Harris-Madison Sch. Corp.*, 256 F. Supp. 2d 854, 855 (N.D. Ind. 2003). The Eighth Circuit addressed the compensability of time that commercial, over-the-road truckdrivers spent conducting "pre-trip safety inspections" required by federal regulations. *See Barrentine*, 750 F.2d at 49-50. The District of Kansas found that required "pre- and post-trip inspections were an integral and indispensable part of Plaintiffs' principal activities for which they were employed." *Scott*, 2009 WL 3561301, at *11. However, not only did that case concern full-time truck drivers, *see id*. at *1, but the employees had to complete the inspections as "a condition of their employment," *see id*. at *11. *Hiner* concerned full-time bus drivers who were "required to conduct several safety inspections each day." 256 F. Supp. 2d at 857. All of these cases have facts clearly different than those in this case. Although the Plaintiffs here are similar to a bus driver in some respects, they take turns driving, only drive for a limited time within the normal commute area of Defendant and have other specific duties for which they were hired. In addition, work at the yard included inspecting Defendant's vehicles.

Another case relied upon by Plaintiffs addressed "operators" who were generally required "to be present at the jobsite, speak with the customer about any concerns and expectations relating to the ongoing work, inspect the vehicles and equipment, and ensure that the crew had all the

necessary tools to complete the job." *See Depew v. Mobile Dredging & Pumping Co.*, No. CV 15-03080-JMC, 2017 WL 1382307, at *2 (D. Md. Apr. 18, 2017). As framed by the court, "the question before the Court [wa]s whether these uncompensated activities—loading/unloading and inspecting Mobile vehicles and driving them to and from Sparrows Point and Blue Plains—were 'integral and indispensable'" to their employment." *Id*. at *7. The court was unable to state "that the unpaid time is, as a matter of law, categorically exempt from compensation under the Portal-to-Portal Act" because "time spent loading and unloading equipment and tools into employer vehicles (in this case, ten to thirty minutes per day), can be, under certain circumstances, 'integral and indispensable' to an employee's work activities and, together with subsequent travel time, can therefore be compensable." *Id*. at *8. Nor could the court state that inspecting the "vehicles and driving them to and from the jobsites were not 'integral and indispensable' to their work responsibilities," because the plaintiffs "were, arguably, not using [the company] vehicles merely as a means of getting to the jobsite," in that the vehicles were loaded with equipment and "some of the vehicles themselves appear[ed] to have special functionality." *Id*.

*Depew* contains several distinguishing facts. The plaintiffs in Depew would go from their home to a meeting place to get a company vehicle and load it with equipment. The Plaintiffs here did not meet anywhere to obtain the company vehicle. Instead, the vehicle was at their hotel. The vehicle here was a normal passenger van, not any type of vehicle that had any special functionality to be used on the jobsite. While the Plaintiffs here would at times load some equipment, the scope appears much less. The *Depew* case seems more analogous to the Plaintiffs in this case travelling to the yard to commence work before traveling on to a well site. And in such circumstances, the inspection at the yard would be compensable, just as the inspection was in *Depew*.

For these reasons, the cases relied on by Plaintiffs are not persuasive to the Court. Other than inspections that may have occurred at the yard, the inspections performed by Plaintiffs do

not constitute a principal activity. The time spent conducting pre- or post-trip inspections is not compensable and does not start or end the workday for any Plaintiff.

### 5. Other Pre- and Post-trip Activities

Plaintiffs contend that they engaged in compensable pre-trip activities when they loaded and organized tools or equipment and attended safety meetings at the hotel. They also contend that, after returning to the hotel, they would unload equipment, attend meetings, make phone calls, and complete paperwork.

Like the pre- and post-trip inspections, these other activities are neither principal activities themselves nor by virtue of being integral and indispensable to any principal activity. Furthermore, for morning and evening riders, end-of-day reports and transporting tools are incidental to the use of a company vehicle and not compensable under the ECFA. *See Buzek*, 501 F. Supp. 2d at 880-86. And, even if the Court were to find them integral and indispensable to a principal activity, the summary judgment evidence shows such activities to be de minimis in nature. Plaintiffs have not carried their burden to show these pre-trip activities required more than a de minimis amount of time.

### 6. Beginning and Ending of the Workday

Given the preceding paragraphs, a given Plaintiff's workday would commence at one of two times. For morning drivers, the workday commenced with the drive. For morning riders, the workday began when they arrived at the jobsite, either a well site or Defendant's yard and commenced their principal activities. Similarly, for evening drivers, the workday ended with the arrival back at the hotel. And the workday ended for evening riders with the completion of their last principal activity at the jobsite before the drive to the hotel.

## E. Summary as to Subclasses

Because the Plaintiffs took turns driving, Defendant is not entitled to summary judgment

as to any claim for drive time – as defined as time actually spent driving. On the summary judg-ment evidence viewed in the light most favorable to Plaintiffs, such time is compensable. And as mentioned in the section discussing discretionary bonuses, this apparently compensable time also proceeds as a non-discretionary-bonus claim alternative to compensability. Thus, actual driving time proceeds to trial on these alternative bases.

Because riding time is not compensable, it only proceeds to trial as a standalone claim based on non-discretionary bonuses. And time spent performing pre- or post-trip inspections or other activities does not proceed to trial at all.

**F. Standby or On-Call Time**

Through their final motion for summary judgment, Defendant seeks dismissal of Plain-tiffs' FLSA claims based upon standby time. ECF No. 142 at 2. It states that during discovery Plaintiffs identified two categories relevant to this claim: "(1) on-call time spent at the hotel/man camp," which Defendant refers to as "Standby Time" or "On-Call Time," and "(2) down time while at the well site," which Defendant refers to as "Down Time." *See id*. at 3. According to Defendant, the first category occurs when Plaintiffs were not needed at the well site "because drilling or other operations would go down for one reason or another." ECF No. 58-2 (Mason Decl.) ¶ 6. It argues that "[t]he only standby time that Fuelco did not pay as compensable work-ing hours was time spent at the hotel and/or man-camp on call with minimal restrictions." ECF No. 142 at 1.

Plaintiffs argue that Defendant classified a wide range of work as standby time, including work performed at the yard, maintaining Defendant's vehicles, and providing transport. *See* ECF No. 154 at 1. And, to counter Defendant's argument, Plaintiffs present evidence to show that ar-gument is demonstrably false. *See* ECF No. 154 at 7-8 & n.6 (identifying evidence). By way of example, they present timecards produced in discovery to show that they submitted, as standby

time, time they actually worked. *See id.*

Defendant counters that the evidence shows that Plaintiffs merely misreported their time on the wrong timecard. *See* ECF No. 156 at 2-3, 43-46. And that the misreporting, rather than any company policy, resulted in any underpayment of overtime pay based on standby time. *See id.* at 44-45. Defendant contends that Plaintiffs concede "that the time Fuelco refers to as 'Standby Time' . . . is not compensable," but "attempt to overcome summary judgment by confusing the issues." *Id.* at 43.

Defendant's contention begins with the premise that Plaintiffs make a concession as to time Defendant, itself, "refers to as 'Standby Time.'" Plaintiffs explain in their response that there appears to be a disconnect between how Defendant defines "Standby Time" and how it conducts payroll. *See* ECF No. 154 at 4-6. Defendant may disagree but viewing the evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could find that the time was reported as standby time as required by Defendant, rather than merely being misreported. Furthermore, Defendant's company policy was to audit every timecard for accuracy. Viewing the evidence in the light most favorable to Plaintiffs, if time was misreported, Defendant had an opportunity to correct it and make the correct payment.

For these reasons, Defendant has not carried its summary judgment burden to show that Plaintiffs cannot succeed on their standby claim as a matter of law. Plaintiffs have presented evidence to create a factual dispute as to whether Defendant required them to report certain time as standby time when it was actual work time. Further, if Defendant did not require such reporting, then there is a factual dispute as to why it was not corrected.

Defendant, furthermore, argues that the misreported time was not compensable in any event because it was de minimis. ECF No. 156 at 44-45. But again, it has not carried its summary judgment burden to show that Plaintiffs cannot succeed on their standby claim due to the de min-

imis nature of the time expended. By way of example, Plaintiff Lewis Pafford avers that he was paid for standby time in November 2017 when he worked six hours one day, eight hours another day, and nine hours a third day. ECF No. 150-1 at 125-26 ¶¶ 23-26. This time is well above a de minimis level. And, viewing his declaration in the light most favorable to Plaintiffs, the declaration does not reflect that he misreported the time – it instead reflects that he reported his time in accordance with Defendant's time categorizations. *See id*. at 125 ¶ 22. Plaintiffs have presented evidence that their time was more than de minimis.

When previously considering summary judgment regarding standby time, the Magistrate Judge found genuine disputes of material fact that precluded summary judgment. R&R at 6. At that time, there were concerns about the freedom employees enjoyed at the hotel, *id*. at 9 n.2, an issue no longer pressed by Plaintiffs. But there was also a dispute as to where the time was spent. *Id*. at 9-10. That factual dispute remains.

## VIII. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment Regarding First Sub-Class (Pre-trip Inspections) and Rate of Pay Claims (ECF No. 138); **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment Regarding Second Sub-Class (No Pre-trip Inspections) (ECF No. 139); **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment Regarding Third Sub-Class (Post-trip Inspections) (ECF No. 140); **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment Regarding Fourth Sub-Class (No Post-trip Inspections) (ECF No. 141); and **DENIES** Defendant's Motion for Summary Judgment on FLSA Claims for Standby/On-call Time (ECF No. 142).

The Court grants each of the first four motions in only the following respects: (1) riding time is not compensable other than perhaps as a non-discretionary bonus and (2) pre- and post-

trip inspections or other activities are not compensable as stated herein. The Court otherwise denies these motions and the motion regarding standby time. By separate order, the Court will set this consolidated action for bench trial. Although this action was consolidated for all pretrial purposes only, *see* Order Consolidating Cases (ECF No. 106), no party has requested a separate trial in any respect.

**IT is so ORDERED.**

**SIGNED this 28th day of September 2022.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**